In re STATE POLICE LITIGATION.

Civ. No. B–89–606 (TFGD).

United States District Court,
D. Connecticut.

May 16, 1995.

Vincent M. Musto, Christopher D. Bernard, James D. Horwitz, Koskoff, Koskoff & Bieder, P.C., Bridgeport, CT, for plaintiffs.

Carl A. Secola, Jr., Kinney, Sullivan & Secola, New Haven, CT, R. Bartley Halloran, Alfano, Halloran & Flynn, Hartford, CT, Christopher D. Bernard, Koskoff, Koskoff & Bieder, P.C., Bridgeport, CT, John R. Williams, the Law Offices of John R. Williams, Steven J. Errante, Hugh F. Keefe, Lynch, Traub, Keefe & Errante, New Haven, CT, Barry S. Zitser, Perakos, Kindl & Zitser, Jon S. Berk, Eileen McCarthy Geel, Christopher L. Slack, Gordon, Muir & Foley, Hartford, CT, Robert Nastri, Jr., Tinley, Nastri & Renehan, Waterbury, CT, and Lisa Marie Ferraro, Moore & O'Brien, Cheshire, CT, for consolidated plaintiffs.

Garrett M. Moore, Lisa Marie Ferraro, Moore & O'Brien, Cheshire, CT, William P. Yelenak, Carmody & Torrance, New Haven, CT, and M. Donald Cardwell, Cardwell, Cardwell & Smoragiewicz, Hartford, CT, for intervenors-plaintiffs.

Stephen P. Fogerty, Mark A. Newcity, Halloran & Sage, Hartford, CT, Joseph J. Patchen, Shapiro & Greenspan, New Haven, CT, Mary P. Brigham, Waterbury, CT, Mark A. Pagani, Wethersfield, CT, Stephen Richard Sarnoski, Stephen J. O'Neill, Henri Alexandre, Atty. General's Office, Public Safety & Special Revenue, Hartford, CT, for defendants.

Stephen P. Fogerty, Halloran & Sage and R. Bartley Halloran, Alfano, Halloran & Flynn, Hartford, CT, for consolidated defendants.

John B. Hughes, U.S. Attorney's Office, New Haven, CT, for movant.

William Smith, Newtown, CT, pro se.

## RULING ON PENDING MOTIONS

DALY, District Judge.

This case arose after the Connecticut State Police began a policy of automatically recording all calls made into and out of each State Police barracks in the State. The policy first received public attention in November 1989, leading to the filing of the several lawsuits consolidated in this action. The Court has certified a plaintiff class, composed of all persons who unknowingly made recorded calls into or out of State Police facilities between January 1, 1978 and November 9, 1989, as well as a subclass composed of current and former State Police employees who likewise participated in recorded communications in that period and who are not named as defendants. Plaintiffs and intervening plaintiffs[1] claim that the recording of their conversations violated their constitutional and statutory rights under both federal and state law. The parties have conducted thor-

---

1. Plaintiffs and intervening plaintiffs are referred to collectively herein as "plaintiffs" unless otherwise noted.

ough discovery, and now file various dispositive motions.

## BACKGROUND

### A. Facts

Except as noted, the parties agree on the following material facts.

#### 1. *Overview*

The Connecticut State Police is a Division of the Department of Public Safety, which, *inter alia,* provides police services to Bradley International Airport and the eighty-four towns in the State that do not have organized police departments. The Division is organized into three districts, each commanded by a District Major, and each district is divided into four troops, commanded by Troop Commanders holding captain's rank. Each troop, in turn, operates through a barracks at which all administrative functions are performed.[2]

Defendant Lester J. Forst (Forst) commanded the Division during the period in question, and he held the title of Commissioner and was the agency's sole political appointee. Defendant John Mulligan (Mulligan), the Executive Officer, acted as Forst's second-in-command with the rank of lieutenant colonel from May 26, 1981 to November 1989. Beneath Forst and Mulligan in the chain of command were the District Majors, who in turn supervised the Troop Commanders. The State Police also operates a telecommunications unit, which from June 1978 to November 1989 was commanded by defendant Ronald P. Mikulka (Mikulka), who held the ranks of Lieutenant and Captain during this period. The telecommunications unit also employed Dominic Console (Console), a civilian employee responsible for the management of the Message Center at the State Police headquarters in Hartford and, later, all State Police telecommunications.

#### 2. *The Telephone Recording Systems*

The State Police first installed a recording machine on its telephone lines at the Message Center at Headquarters on April 24, 1972,[3] and automatic taping systems were in place at each barracks by June 26, 1978. These recorders were intended to enable the State Police to record and, if necessary, play back incoming emergency calls from the public. This would occur, for example, if a dispatcher received a request for assistance in which an essential fact (e.g., a street address) remained unclear. The systems also were intended to assist in investigations of complaints made by the public against personnel, to establish the timing of complaints and responses for major investigations, and to provide a method of ensuring that troopers and dispatchers were handling calls properly. The recorders did not distinguish between incoming and outgoing calls.

The State Police initially sought to record all telephone lines available to the public, and all radio communications, except for the Troop Commanders' private lines and the lines used by confidential informants.[4] Since the recorders had limited capacities, however, the Troop Commanders were authorized to determine the lines to be recorded in their respective barracks. The recorders operated automatically on designated lines, on which a caller would be placed by the computer in the Division's "Horizon" telephone system. The recorders employed two recording tapes, one for continuous recording and one for any necessary rewinding and listening. State Police Special Order 91–A, issued in 1979, directed each barracks to change the two tapes on each machine every twenty-four hours, and to retain all tapes for sixty days before erasure and reuse.

---

2. The three districts, and their troop designations and barracks locations, are as follows: *Western District:* Troops A (Southbury); B (Canaan); G (Westport); L (Litchfield); *Central District:* Troops F (Westbrook); H (Hartford); I (Bethany); W (Windsor Locks); *Eastern District:* Troops C (Stafford Springs); D (Danielson); E (Montville); and K (Colchester).

3. This original 10 channel recorder was replaced in January 1974 by a 20 channel Dictalog recorder.

4. The State Police did not maintain public pay telephones at all barracks, and by November 9, 1989 only six of the twelve barracks had pay telephones.

The pre-existing communications practices in the barracks affected the operations of the recording systems. Each barracks operated several local telephone lines to provide residents within their respective jurisdictions with toll-free access. Prior to state-wide implementation of the "911" system in 1989, therefore, all requests for both emergency and non-emergency police services to a given barracks were made on regular seven-digit numbers, and these numbers continued to be used by callers after the "911" system was installed. Troopers, arrestees and others used these lines to place outgoing calls, while intra-departmental calls usually were placed on "Centrex" lines.

The recorders were connected to the telephone lines of the relevant carriers, the Southern New England Telephone Company (SNET) and the Woodbury Telephone Company (Telephone Companies). The Telephone Companies did not supply the recorders, but instead connected the telephone lines to devices known as "demarcation punch blocks" at each barracks, which in turn were connected to the recorders. These devices, which were leased from the Telephone Companies, enabled the telephone system in each barracks to work equally well with or without the recorders running. The physical connection of individual lines at a punch block to a recorder in the barracks was not performed by the Telephone Companies, but was the responsibility of the State Police. In addition FCC regulations required the use of a coupler between the recorders and the telephone line, because the recorders were not FCC-approved. These couplers emitted beep tones at 15–second intervals, and the telephone lines could be recorded even if a coupler's beep tone was not functioning.

The 20–channel Dictalog recorders installed by the State Police in 1978 could not record all designated lines in all barracks. A May 1985 status report noted that many of these recorders were malfunctioning completely or were at various levels of function. The State Police decided to replace them, and received a budgetary allocation for five new Stancil recorders in 1986. These new recorders, each of which had a 40–channel taping capacity, were installed by the Division's service company at Troops B, C, I, and W, and at the Headquarters Message Center. The Stancil recorders were FCC-approved and did not require couplers to be connected to the telephone lines. Instead, these machines had built-in beep tone generator chips. The Division directed its service company to remove these chips during April and May 1988.[5]

Another internal survey of the recording system, completed on February 23, 1988, determined that several of the older Dictalog recorders had ceased to function and that the remaining Dictalog recorders were at various levels of repair. The State Police decided to purchase eight new 40 channel Dictalog recorders to replace the older Dictalog recorders at Troops A, D, E, F, G, H, K, and L. As with all prior purchases of telephone recorders, these machines were obtained through the normal state bidding process, which required the publication of requests for bids in major state newspapers. As of November 9, 1989 only one of these new Dictalog recorders had been installed, at Troop A. This recorder had beep tones.

Prior to December 1986 the State Police relied on the beep tones to notify State Police personnel and members of the public of the recording of telephone conversations. By 1986 some lines at various troops emitted beep tones but were not recorded, while some recorded lines did not have beep tones.

---

**5.** The Stancil recorders were installed, and the beep generating chips subsequently were removed, as follows:

| Troop | Installation Date | Beep Removal Date |
|---|---|---|
| Troop B | April 27, 1987 | May 27, 1988 |
| Troop C | April 29, 1987 | April 29, 1988 |
| Headquarters | May 7, 1987 | April 21, 1988 |
| Troop I | May 8, 1987 | April 22, 1988 |
| Troop W | May 15, 1987 | May 5, 1988 |

Pltfs' Response to Defts' Facts, exh. 7. There is some question, however, whether the beep tones were functioning or were removed prior to this period. *See id.* exh. 7 (State Police inventory,

Defendants further assert that the public was advised in local area telephone books that calls to police, fire and other emergency facilities could be recorded without the need for beep tones or permission of the caller. Defendants do not assert, however, that this notification applied to calls made from State Police facilities. Finally, defendants assert that all State Police personnel were on notice that all telephone lines were recorded because the recorders were located in the dispatch area or the sergeant's office at each barracks, and thus were visible.[6]

In sum, it is undisputed that as of November 1989 Troops B, C, I, W and the Headquarters Message Center had functioning 40 channel Stancil recorders; Troop A had a functioning 40 channel Dictaphone recorder; Troop G had a functioning 20 channel Dictalog recorder; Troops D, E, F, K and L had no functioning recorders; and Troop H had no functioning recorder, although several of its lines were being recorded at the Headquarters Message Center as of September 30, 1988. It was known by the State Police when these recording systems were installed, and at all subsequent times, that they recorded both incoming and outgoing calls; that they recorded specific telephone lines (onto which calls from all telephone handsets were routed automatically) rather than specific telephone handsets; and that there existed no unrecorded lines dedicated for use by detainees, arrestees or suspects. The parties contest the degree to which the beep tones operated effectively to notify users that a given line was recorded, as well as the significance of notifications in telephone books or the visibility of the recorders themselves.

### 3. Recording Policy

The Division's recording policy was unclear from the start. After the recorders were installed Captain Mikulka, the Telecommunications Chief, required that all requests to change the lines recorded, or to change beep tones on lines, be in writing. In a June 26, 1978 dated memorandum Mikulka advised defendant Donald Nurse (Nurse), District Major for the Central District, of his position that all lines used by the public should be recorded except for the Centrex lines, the troop lieutenants' private lines, and the informants' lines. While Nurse did not respond, Mikulka did receive a June 30, 1978 dated response from defendant Walter J. Scholtz (Scholtz), District Major for the Eastern District. Scholtz agreed with Mikulka's suggestions, and further advised Mikulka that Troop D's recorded lines did not have a beep tone. Mikulka never sought or obtained confirmation from Forst, Mulligan or the other District Majors concerning the use of the recorders, and thus no recording policy was established following the recorders' installation.

Two events then occurred of particular relevance to the Division's recording practice. First, on August 9, 1983 the Connecticut Supreme Court decided *State v. Ferrell*, 191 Conn. 37, 463 A.2d 573 (1983). *Ferrell* involved a murder conviction based, in part, on the testimony of two State Police troopers, who testified to inculpatory statements made by the defendant during two telephone conversations with his attorneys. Although both calls were recorded, the troopers based their testimony on the defendant's side of the conversations, which they overheard because the telephone they offered him was in the barracks report room.[7] The Connecticut Supreme Court reversed the conviction, finding that "the defendant's attempt to exercise his right to consult with an attorney resulted in the interception by the authorities of the very sort of incriminating statement which the *Miranda* warnings seek to guard against," and ruled that the admission of the statements violated the defendant's due pro-

---

dated February 23, 1988, stating lines at Troops C, I and W were being recorded without beep tones).

**6.** All recorders measured approximately 25 inches wide, 18¾ inches deep, and 72 inches high, and were about the size of a narrow refrigerator.

**7.** The tape recordings of the conversations were never admitted into evidence. Notably, however, the Connecticut Supreme Court remarked that the recording of the defendant's outgoing call to his first attorney did not register a beep tone, while an incoming call from his second attorney did "contain muted warning beeps." *Ferrell*, 191 Conn. at 39 n. 2, 463 A.2d 573.

cess rights. *Ferrell,* 191 Conn. at 43, 463 A.2d 573 (citing Conn. Const. art. I, § 8; *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Malinski v. New York,* 324 U.S. 401, 416, 65 S.Ct. 781, 788–89, 89 L.Ed. 1029 (1945)).

Mikulka read an article about the *Ferrell* decision in the *Hartford Courant* and asked Telecommunications Coordinator Console to provide an estimate of the cost of installing a separate unrecorded telephone line in each of the troops for use by arrestees. Mikulka then wrote a memorandum to Major Nurse on August 11, 1983, which stated:

> The attached article in the HTFD Courant (8/10/83) indicates that Police are obliged to provide a private telephone for accuseds [sic] to consult with their attorney.
>
> We should have a clear policy on this situation. If necessary we will arrange for the proper phone equipment. There are several options available. The simplest would be to provide a separate phone set with a local line that could be kept in the interrogation room and jacked in when needed. Based on 13 troops, the cost would be $260 per month and $1300 installation.

Pltfs' exh. 22. Mikulka received no response to this memorandum, and he took no further steps to determine whether the State Police were recording attorney-client telephone calls. Indeed, at no time prior to November 1989 did the State Police enunciate a formal policy to assure an arrestee was provided access to an unrecorded telephone line.

Second, in 1984 Commissioner Forst requested the Connecticut Attorney General to give an opinion as to the legality of intercepting wire and oral communications in a hostage or terrorist situation which poses a clear and present danger to the lives of troopers and citizens. The Attorney General responded to this request in a March 24, 1986 dated opinion letter, which stated: "we conclude that you may not intercept wire communications even in these circumstances without a warrant." *See* Pltfs' exh. 26.

On December 3, 1986, after the purchase but prior to the installation of the five new Stancil recorders, Console sent a memorandum requesting advice on recording policy to defendant Henry Bourgeois (Bourgeois), then a lieutenant and the commanding officer of the Message Center at headquarters.[8] Bourgeois passed Console's memorandum to Mikulka for a reply, and Mikulka raised the issue with the district majors and other top officials at the weekly staff meeting on December 10, 1986. Specifically, Mikulka recommended that all incoming lines used by the public be recorded, that the administrative Centrex lines not be recorded, and that all recorded lines emit a beep tone. This latter issue received attention because there had been complaints that the beep tones interfered with the audibility of important conversations, and it was believed that the beep tones were not needed so long as at least one of the parties to the conversation was on notice that it was being recorded. The participants discussed replacing the beeps with warning labels on all recorded lines, but no formal decision was made at this meeting.

Mulligan subsequently decided that both incoming and outgoing telephone lines should be recorded, with the exception of the troop commander's private line and the informant's lines. Mulligan also decided that the beep tones should be removed on all recorders and replaced by warning labels. Mulligan informed Mikulka of these decisions, and Mikulka in turn drafted a memorandum to Bourgeois and Console directing that this policy be implemented. No Headquarters Special Order was distributed notifying State Police employees of this change of policy.

Mikulka directed Bourgeois to order the warning labels shortly after the December 10, 1986 meeting. The exact specifications

---

8. Console's memorandum stated:

> I BELIEVE THIS IS THE APPROPRIATE TIME TO REMIND TOP MANAGEMENT RE: THE RECORDING OF ALL TELEPHONE LINES TERMINATING AT THE TROOPS.

> WHAT IS THEIR PLEASURE? WHAT LINE SHOULD OR SHOULDN'T BE RECORDED? WHO SHOULD MAKE THAT DECISION? ETC.
> PLEASE ADVISE.
> Pltfs' exh. 29.

for the labels were not finalized and the labels were not ordered until March 23, 1987, and were not shipped until April 10, 1987.[9] Although the labels were distributed, the parties disagree whether the beep tones were removed prior to the installation of the labels, and plaintiffs further contend that some barracks never installed the warning labels and that those that did were not conscientious about replacing worn or removed labels. Subsequent to December 10, 1986 only the personnel at Troop H were notified in writing of the removal of the beep tones, through a "read and sign" memorandum posted by the Troop Commander on April 24, 1989.

In January, 1988, the State Police published a new Administrative and Operations Manual (Operations Manual). It assembled into one volume all Headquarters Special Orders, General Orders, and Rules and Regulations. Section 15.1.10 of the Operations Manual provided:

> Dictalog recording machines are assigned to all troops and the Headquarters Communications Section to record all radio and telephone conversations transmitted or received at the Troops and Headquarters Communications Section.[10]

Section 15.1.10 constituted the first formal written order available to personnel concerning the State Police recording policy.[11] This section did not state any guidelines covering the use of beep tones, warning labels, or other notification or consent procedures, and the Operations Manual also established no policy governing the recording of calls made by arrestees to their attorneys.

### 4. *How Tapes Were Reviewed*

Tapes of conversations recorded at the barracks were reviewed in three circum-stances. First, operators and other personnel could rewind and listen to tapes as needed in emergency situations, such as a call requesting help in which an address was unclear. Second, the tapes also were used for specific internal affairs investigations in cases of alleged employee misconduct. In this context some internal investigations led to the monitoring of employees' conversations prior to the initiation of an official internal affairs investigation. Third, a separate Inspections Unit reviewed tapes for administrative purposes. The Inspections Unit generally took tapes from the barracks to a separate location, usually headquarters, and spent a full day reviewing them. This Unit reported directly to Colonel Mulligan.

All internal investigations or inspections required a trooper to search for a conversation on a particular tape by listening to the entire tape until the specific conversation was identified. If information obtained in a tape recording was relevant to an internal affairs investigation, the tape could be used against the employee in departmental hearings.

### 5. *Public Discovery of the Recording*

Robert Little was arrested by the State Police on August 5, 1988, after a motor vehicle accident, and was brought to Troop A in Southbury. Following his arrest Little made two calls to his attorney and two calls to relatives to arrange his release. During a pre-trial hearing on November 3, 1989, questioning by Little's attorney of a State Police trooper revealed that all four of Little's calls had been recorded without his consent and without prior notification. No warning labels existed in the barracks or on the telephones themselves, there was no audible beep tone on the line Little used, and Little was neither advised of the recording nor told that he

---

**9.** The labels simply stated: "Conversations on this phone are recorded."

**10.** The Operations Manual further stated:
The information on the logging recorders shall be available to the following Division officials:
(a) Commissioner (or his designee), and the Executive Officer;
(b) District Commanding Officers; and,
(c) Troop Commanding Officers.
*Exception:* The supervisor, desk officer or dispatcher on duty are [sic] authorized to play

back telephone and radio conversation as necessary, in order to clarify the content of the telephone conversation or radio message, for job-related public safety purposes.
Pltfs' Exh. 7, at 57–58.

**11.** Headquarters Special Order 91–A, the December 21, 1979 dated directive that established a maintenance policy governing the recorders, did not specify which telephone lines were recorded nor did it set forth any notification requirements.

could have access to an unrecorded line. *See* Pltfs' exh. 24 (Testimony of Trooper Maryann Daley in *State v. Little,* CR4–156380, MV4–298174, at 2, 61–63, 286 (Nov. 3, 1989)).

Media coverage of the *Little* case caused an uproar. Governor William O'Neill asked for and received Commissioner Forst's immediate resignation on November 12, 1989,[12] and the new Commissioner of Public Safety, Bernard R. Sullivan, demoted Colonel Mulligan, who subsequently also resigned. Governor O'Neill also ordered an investigation of the recording practices of the State Police, and the Governor's Review Committee Report was issued on November 29, 1989. *See* Pltfs' exh. 7.

## B. Procedural History

This action began on November 9, 1989 with the filing of *Connecticut Criminal Defense Lawyers Association v. Lester J. Forst,* Civ. No. B–89–606 (TFGD). The Court, on January 16, 1990, granted a motion to intervene as party plaintiffs by the Connecticut State Police Union and Troopers David Phipps, Robert Kowalczyk and Martin White. Eight additional actions were then filed involving 187 individuals, and the Court consolidated the actions on June 7, 1990. Subsequent actions added various additional defendants and the State of Connecticut. On May 2, 1991, the Court granted defendants' motion to dismiss in part, dismissing plaintiffs' and intervening plaintiffs' claims for monetary damages against the State and against the individual defendants in their official capacities, while preserving plaintiffs' and intervening plaintiffs' claims for injunctive relief against all defendants as well as their claims for monetary damages against the individual defendants in their individual capacities.

On November 8, 1991 the Court granted motions for class certification and certified a class of the following individuals:

All persons who participated in wire or oral communications to, from, or within State Police facilities between January 1, 1974 and November 9, 1989 whose communications were intercepted, recorded and/or used by the defendants in violation of the law.

The Court further defined a subclass composed of the following individuals:

The Connecticut State Police Union, current and former Connecticut State Police officers who are not defendants in this or any consolidated case, and other persons acting on behalf of the State Police who participated in wire or oral communications to, from, or within State Police facilities between January 1, 1974 and November 9, 1989 whose communications were intercepted, recorded and/or used by the defendants in violation of the law.

By Order filed December 26, 1991, the Court amended the onset date of the class and subclass from January 1, 1974 to January 1, 1978. Plaintiffs then gave public notice of the consolidated class action in accordance with the Court's June 8, 1992 and July 8, 1992 filed Orders.

Plaintiffs' Third Amended Complaint summarizes the facts discussed above, and asserts the following legal claims: interception of wire and oral communications in violation of the Federal Communication Act of 1934, 47 U.S.C. § 605 *et seq.,* and the Omnibus Crime Control and Safe Streets Act of 1968 (Title III), 18 U.S.C. § 2510 *et seq.* (Count I); various violations of plaintiffs' rights under the First, Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983 (Count II); various violations of plaintiffs' rights under Article I, Sections 2, 4, 5, 7, 8, 9, 10, 11, 14, 19, and 20 of the Connecticut Constitution and the statutes and laws of Connecticut (Count III); fraudulent concealment of the recording of plaintiffs' conversa-

---

**12.** Notably, following his resignation Forst stated in an interview that both he and Mulligan were unaware that the recording system was recording all telephone calls, including those between suspects and their attorneys. *See* "Forst says issue was exaggerated," Hartford Courant, Nov. 13, 1989, at A4. Mulligan subsequently made a similar statement. *See* "Mulligan denies he knew of illegal taping," Hartford Courant, Nov. 22, 1989, at A7 ("I think every single person of the management staff thought that there were lines available for conversations that were non-recorded."). The scandal also resulted in an investigation by the Federal Bureau of Investigation and a request for a Congressional inquiry.

tions, resulting in the delay of discovery of the recording until November 1989 (Count IV); invasion of plaintiffs' right of privacy, as guaranteed under the federal and state constitutions and Connecticut common law (Count V); and indemnification of the individual defendants by the State of Connecticut (Count VI). The Amended Complaint requests compensatory and punitive damages and attorneys' fees from the individual defendants in their individual capacities, as well as an injunction prohibiting the individual defendants and the State of Connecticut from continuing to conduct unauthorized recording or from disclosing or destroying any existing tape recordings or other evidence of recorded conversations without a court order.[13]

Now before the Court, after the close of a lengthy discovery period, are motions seeking to dispose of all of the above claims. Several individual defendants move for summary judgment on all counts of both plaintiffs' and intervening plaintiffs' Third Amended Complaints. The State of Connecticut does not join in that motion, as it remains a defendant only for the purposes of injunctive and declaratory relief, and instead moves to dismiss plaintiffs' request for a judgment declaring the State's responsibility to indemnify any damages assessed against the individual defendants. Plaintiffs, in turn, move for partial summary judgment in their favor on their claims under Title III and the Connecticut Wiretap Act for all conversations recorded between January 20, 1987 and November 9, 1989. Several individual plaintiffs also have filed separate motions.

## DISCUSSION

### I. Preliminary Issues

#### A. *Applicable Standard of Review*

Except as noted below, the Court reviews the parties' motions under the familiar summary judgment standard. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R.Civ.P. 56(c); *see Anderson v. Liberty Lob-*

*by, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). This burden may be met by demonstrating that there is a lack of evidence to support the nonmoving party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). Once the moving party satisfies this initial burden, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e).

While the Court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Conclusory allegations in legal memoranda are not evidence, and cannot by themselves create a genuine issue of material fact where none would otherwise exist. *Project Release v. Prevost*, 722 F.2d 960, 969 (2d Cir.1983). Finally, the burden of demonstrating the absence of a genuine issue of fact does not shift when cross-motions are before the Court, as each motion must be judged on its own merits. *Eastman Mach. Co. v. United States*, 841 F.2d 469, 473 (2d Cir.1988).

#### B. *Statute of Limitations*

Defendants first seek dismissal of all claims arising prior to November 9, 1987, on the ground that such claims are time-barred.

Plaintiffs' federal statutory claims are governed by the limitations period set forth in Title III, which requires a claimant to file an action within "two years after the date upon which the claimant first has a reasonable opportunity to discover the violation." 18 U.S.C. § 2520(e). Plaintiffs' federal constitutional claims are governed by 42 U.S.C. § 1983, for which the Court must

---

**13.** The intervening plaintiffs' Third Amended Complaint, filed on behalf of the subclass of

State Police employees, is substantively identical to the plaintiffs' Third Amended Complaint.

apply the general or residual limitations statute of Connecticut. *See Wilson v. Garcia,* 471 U.S. 261, 280, 105 S.Ct. 1938, 1949, 85 L.Ed.2d 254 (1985). The length of the limitations period, and related questions of tolling and application, also are governed by state law. *Id.* at 266–67, 105 S.Ct. at 1941–42. Connecticut General Statutes § 52–584 establishes a two-year limitations period for negligence actions, and defendants argue it should apply here. Defendants rely on *Mihalcik v. Lensink,* 732 F.Supp. 299, 305 (D.Conn.1990), in which the Court applied section 52–584 to federal equal protection and due process claims asserted against the State by patients in state mental institutions.

The *Mihalcik* case is an aberration. All other federal and state courts in Connecticut that have considered the question have construed section 52–577, not section 52–584, as the residual limitations statute applicable to civil rights actions. *See, e.g., Orticelli v. Powers,* 197 Conn. 9, 16, 495 A.2d 1023 (1985) (noting Conn.Gen.Stat. § 52–577 is "operative statute of limitations in a § 1983 action"); *see also Williams v. Walsh,* 558 F.2d 667, 670–71 (2d Cir.1977); *Brown v. Wargo,* 815 F.Supp. 59, 60 (D.Conn.1992); *Mitchell v. Hartford,* 674 F.Supp. 60, 62–63 n. 2 (D.Conn.1986); *Vitale v. Nuzzo,* 674 F.Supp. 402, 404 (D.Conn.1986); *Weber v. Amendola,* 635 F.Supp. 1527, 1531 (D.Conn.1985); *Members of Bridgeport Housing Auth. Police Force v. Bridgeport,* 85 F.R.D. 624, 637 (D.Conn.1980). Section 52–577 also governs plaintiffs' claims pursuant to the Connecticut Constitution and state common law. *See Orticelli,* 197 Conn. at 16, 495 A.2d 1023. Plaintiffs' claims under the State Wiretap Act, which contains no limitations period, likewise fall under section 52–577.

■ Section 52–577 bars any claim filed more than three years after the date on which a plaintiff should have discovered the elements of the cause of action, *see Sandstrom v. Chemlawn Corp.,* 759 F.Supp. 84, 86 n. 1 (D.Conn.1991); *Lambert v. Stovell,* 205 Conn. 1, 6, 529 A.2d 710 (1987), while Title III sets a two-year limitations period for federal wiretap claims. *See* 18 U.S.C. § 2520(e). Plaintiffs argue that, regardless of the statute of limitations applied, all claims arising during the class period are timely because the recording of their conversations was not discovered until November 1989, defendants fraudulently concealed their recording practices, and the recording constituted a continuing violation of constitutional and statutory law. Defendants contend, in response, that the installation of the recording system was not secret, that their use of the system was never concealed, and that plaintiffs were given notice of the recording through warnings in telephone books, the beep tones and the warning labels. Defendants also assert that the existence of the system was "common knowledge" in the State Police and among criminal defense attorneys, the courts, and the general public.

It is difficult to square defendants' claim of common knowledge with the furor following the publication of the disclosures in the *Little* case. Indeed, both Commissioner Forst and Colonel Mulligan asserted, in press interviews printed after the first of these consolidated cases was filed, that they had no knowledge of the extent of the recording in the State Police barracks. Likewise, there is considerable question whether the beep tones worked consistently, whether the warning labels were affixed to all telephones, and whether all employees of the State Police knew the recording systems taped both incoming and outgoing calls. In short, plaintiffs have established as a genuine issue whether any of the notification methods employed by defendants informed anyone that the State Police automatically recorded all outgoing as well as incoming calls. *See Smith v. Nixon,* 606 F.2d 1183, 1190–91 (D.C.Cir.1979), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981).

■ Plaintiffs' fraudulent concealment argument warrants additional comment.[14] The doctrine of fraudulent concealment is an

---

14. Plaintiffs also allege substantive claims of fraudulent concealment in Count IV of the Third Amended Complaints. Defendants argue that these counts should be dismissed because a claim of fraudulent concealment is not a cause of action on which relief may be granted, but is instead a defense to the statute of limitations. *See Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946) (applying federal law). Such a claim, however, is con-

equitable one that tolls a statute of limitations until such time as a plaintiff discovers or reasonably should have discovered the cause of action. *See Radiology Center, S.C. v. Stifel, Nicolaus & Co.*, 919 F.2d 1216, 1220 (7th Cir.1990). Central to the doctrine is discovery, and it applies where, as here, the defendants' acts are self-concealing. *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir.) ("a plaintiff may prove [fraudulent concealment] by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing"), *cert. denied*, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988); *see also Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1491 (D.C.Cir.1989). Further, the fraudulent concealment doctrine applies not just to a federal statute of limitations but to those state statutes of limitations that are adopted by federal law, *see Riddell*, 866 F.2d at 1491, as well as to state law claims. *See Connell*, 214 Conn. at 250, 571 A.2d 116; *Bound Brook Assoc. v. Norwalk*, 198 Conn. 660, 665, 504 A.2d 1047, *cert. denied*, 479 U.S. 819, 107 S.Ct. 81, 93 L.Ed.2d 36 (1986). Since it is the nature of telephone recording to be self-concealing, and since questions exist concerning the consistent use of either beep tones or warning labels, the fraudulent concealment doctrine also would render timely all of plaintiffs' claims. *See Brown v. American Broadcasting Co.*, 704 F.2d 1296, 1304 (4th Cir. 1983) ("Electronic surveillance is by its very nature a tort which is concealed from a potential plaintiff. Unless the defendant dis-

closed his activity to the plaintiff, or uses the information he obtains in a way which should put the plaintiff on notice of his activity, the tort may remain concealed."); *see also Smith v. Nixon*, 606 F.2d 1183, 1191 (D.C.Cir.1979) (denying summary judgment on statute of limitations grounds where factual issue existed as to whether secrecy surrounding government's wiretap prevented plaintiffs from discovering cause of action), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981); *Awbrey v. Great Atlantic & Pacific Tea Co.*, 505 F.Supp. 604, 607–09 (N.D.Ga. 1980).[15] Accordingly, defendants' statute of limitations argument is rejected.

### C. *Standing*

■ Defendants also argue that the plaintiff Connecticut Criminal Defense Lawyers' Association (CCDLA) lacks standing to pursue this action. CCDLA concedes that it cannot seek monetary damages, *see* Pltfs' Joint Opp. at 82, and thus its claims for monetary damages are dismissed. CCDLA's claims for injunctive and other equitable relief, on the facts of this case, meet the test for representational standing. *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *Warth v. Seldin*, 422 U.S. 490, 515–16, 95 S.Ct. 2197, 2213–14, 45 L.Ed.2d 343 (1975).

### D. *Standards for Immunity Defenses*

#### 1. *Federal Law*

■ Central to defendants' position in this action lies their argument that, to the

---

strued by Connecticut courts as a separate cause of action and not as a defense. *See Connell v. Colwell*, 214 Conn. 242, 250, 571 A.2d 116 (1990) ("[D]efendants were aware of the facts necessary to establish this cause of action ... and that they had intentionally concealed those facts from the plaintiffs.") (quotation omitted). The fraudulent concealment counts therefore survive.

15. Plaintiffs further rely on the continuing violation doctrine, which equitably tolls the running of a limitations period until the date of the last act, when the alleged injury consists of an ongoing practice of unconstitutional or illegal acts. *See Hamilton v. Smith*, 773 F.2d 461, 467 (2d Cir.1985); *Association Against Discrimination in Employment, Inc. v. Bridgeport*, 647 F.2d 256, 259–61 (2d Cir.1981), *cert. denied*, 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982); *Doe v. Blake*, 809 F.Supp. 1020, 1025 (D.Conn.1992);

*Members of Bridgeport Housing Authority Police*, 85 F.R.D. at 637; *see also Cross v. Huttenlocher*, 185 Conn. 390, 400, 440 A.2d 952 (1981) (applying "continuing wrong" doctrine under state law). Since defendants do not deny the existence of their recording policy since 1978, the continuing violation doctrine would appear applicable. Plaintiffs' claims for money damages, however, would require proof of specific recorded calls and the injuries resulting therefrom, and the continuing violation doctrine has been held to apply only where no single act can be identified as the cause of the injury. *See Yokum v. St. Johnsbury Trucking Co.*, 595 F.Supp. 1532, 1534 (D.Conn.1984); *see also Pope v. Bond*, 641 F.Supp. 489, 496 (D.D.C.1986). Given the Court's resolution of the limitations question, there is no need to resolve this issue.

extent plaintiffs seek monetary damages, defendants are protected by the doctrine of qualified immunity.[16] The doctrine provides that "government officials performing discretionary functions[ ] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir.1991). Government officials are "entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Oliveira v. Mayer*, 23 F.3d 642, 648 (2d Cir. 1994) (citing *Ying Jing Gan v. City of New York*, 996 F.2d 522, 531–32 (2d Cir.1993)), *cert. denied*, — U.S. —, —, 115 S.Ct. 721, 722, 130 L.Ed.2d 627 (1995); *see also Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987).

The question of whether a particular right was "clearly established" at the time defendants acted, in turn, depends on "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), *cert. denied*, 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). The right allegedly violated also must have been clearly established in its particular application, rather than simply in general terms. *See Anderson*, 483 U.S. at 639–40, 107 S.Ct. at 3038–39. The specific violation alleged need not have been declared unlawful previously in a reported decision, however, if the

contours of the right are "well-established;" that is, "in the light of pre-existing law the unlawfulness must be apparent." *Ayeni v. Mottola*, 35 F.3d 680, 686 (2d Cir.1994) (quoting *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039).

Once it is determined that a right was "clearly established" at the time of an alleged act, the inquiry turns to whether a reasonable official in defendants' positions would have understood that the act would violate that right. *Ayeni*, 35 F.3d at 686; *Oliveira*, 23 F.3d at 648. The degree to which a right is clearly established affects the objective reasonableness of an official's actions. *Piesco v. New York, Dep't of Personnel*, 933 F.2d 1149, 1161 (2d Cir.1991), *cert. denied*, 502 U.S. 921, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991). Further, high ranking officials charged with applying and enforcing the laws are presumed to know the laws governing their conduct. *See Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir.1989).

Because qualified immunity "is an *immunity from suit* rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (emphasis in original), the issue should be resolved "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991). The Court therefore will consider defendants to be protected by qualified immunity "where the facts concerning the availability of the defense are undisputed," *Oliveira*, 23 F.3d at 649, while keeping in mind that defendants bear the burden of establishing this affirmative defense. *Bieluch v. Sullivan*, 999 F.2d 666, 670 (2d Cir.1993).

### 2. *State Law*

The individual defendants also assert that plaintiffs' state law claims are barred by Connecticut General Statute § 4–165, which requires all negligence claims

---

**16.** The doctrine of qualified immunity shields government officials only from suits seeking money damages in their individual capacities, and does not apply to claims seeking injunctive or declaratory relief. *See Wood v. Strickland*, 420 U.S. 308, 315 n. 6, 95 S.Ct. 992, 997 n. 6, 43 L.Ed.2d 214 (1975) ("[I]mmunity from damages does not ordinarily bar equitable relief as well."),

*overruled in part on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *American Fire, Theft & Collision Managers, Inc. v. Gillespie*, 932 F.2d 816, 818 (9th Cir.1991). The Court thus considers the individual defendants' defense of qualified immunity only with respect to plaintiffs' claims for monetary damages.

against the State to be presented first to the state claims commissioner. In the alternative, defendants contend that they are protected by qualified immunity under state law.

Defendants' exhaustion argument is without merit. While section 4–165 constitutes a legislated exception to the doctrine of sovereign immunity,[17] *see Sullivan v. State,* 189 Conn. 550, 554–57, 457 A.2d 304 (1983), neither that statute nor the doctrine generally bars a claim asserting that a public official "act[ed] in excess of his statutory authority" by violating the Connecticut Constitution or a state statute. *Horton v. Meskill,* 172 Conn. 615, 624, 376 A.2d 359 (1977). Thus the doctrine of sovereign immunity does not shield the individual defendants from plaintiffs' claims pursuant to the Connecticut Constitution or the State Wiretap Act.

■■■■ Further, the exhaustion requirement set forth in section 4–165 does not apply to intentional acts that are "wanton, reckless or malicious." Conn.Gen.Stat. § 4–165.[18] As plaintiffs' state common law claim of invasion of privacy asserts an intentional tort, it falls under this exception. *See Venturi v. Savitt, Inc.,* 191 Conn. 588, 591, 468 A.2d 933 (1983) (citing Restatement (Second) of Torts § 652B ("One who *intentionally* intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable man.") (emphasis added)); *see also Vorvis v. Southern New England Tel. Co.,* 821 F.Supp. 851, 856 (D.Conn.1993); *Goodrich v. Waterbury Republican–American, Inc.,* 188 Conn. 107, 127–28, 448 A.2d 1317

(1982). Accordingly, none of plaintiffs' state law claims are barred by the doctrine of sovereign immunity, nor was prior authorization by the state claims commissioner required. *See Remine v. Deckers,* 871 F.Supp. 1538, 1541–42 (D.Conn.1995); *Tremblay v. Webster,* 1995 WL 93405, *7, 1995 Conn.Super. LEXIS 516, *21–22 (Conn.Sup.Ct.1995) ("Since violating the plaintiffs' civil rights [under federal and state law] cannot be considered to be in the troopers' normal scope of their employment, and the language of the counts sounds in more than mere negligence, the [state] troopers cannot claim immunity under § 4–165.").

Defendants also maintain that they are protected by the doctrine of qualified immunity under Connecticut law. This contention raises a novel issue, in that the Connecticut Supreme Court has never described specifically the form of immunity applicable to employees of the State itself.[19] Under the circumstances, therefore, the Court must do its best "in estimating what the state court would rule to be its law." *Holt v. Seversky Electronatom Corp.,* 452 F.2d 31, 34 (2d Cir. 1971); *see Continental Casualty Co. v. Pullman, Comley, Bradley & Reeves,* 929 F.2d 103, 105 (2d Cir.1991).

■■■■ The application of federal qualified immunity to federal law claims does not control the application of governmental immunity under state law. *See Schnabel v. Tyler,* 230 Conn. 735, 646 A.2d 152, 158 (1994); *Mulligan v. Rioux,* 229 Conn. 716, 643 A.2d 1226, 1235 n. 17 (1994). Rather, the analysis of governmental immunity under Connecticut law begins with the distinction between public and private duties:

**17.** As under federal law, the doctrine of sovereign immunity and section 4–165 do not apply to plaintiffs' claims for injunctive and declaratory relief against the State. *See Doe v. Heintz,* 204 Conn. 17, 31, 526 A.2d 1318 (1987); *see also* May 2, 1991 filed Ruling on Motion to Dismiss at 9 n. 6.

**18.** Section 4–165 provides in pertinent part:

No state officer or employee shall be personally liable for damages or injury, not wanton, reckless or malicious, caused in the discharge of his duties or within the scope of his employment. Any person having a complaint for such damage or injury shall present it as a claim

against the state under the provisions of this chapter.

Conn.Gen.Stat. § 4–165. Chapter 53 generally establishes the office, duties and procedures of the state claims commissioner. *See* Conn.Gen. Stat. § 4–161 *et seq.*

**19.** Rather, the Connecticut Supreme Court's qualified immunity decisions have concerned suits against municipal employees or agencies, and have involved invocation of a specific statutory provision waiving sovereign immunity for suits against municipalities. *See, e.g., Schnabel v. Tyler,* 230 Conn. 735, 646 A.2d 152, 158 (1994).

If the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, must be a public and not an individual injury, and must be redressed if at all in some form of public prosecution. On the other hand, if the duty is a duty to the individual, then a neglect to perform it or to perform it properly, is an individual wrong, and may support an individual action for damages.

*Shore v. Stonington,* 187 Conn. 147, 152, 444 A.2d 1379 (1982) (citations omitted); *see also Gordon v. Bridgeport Housing Auth.,* 208 Conn. 161, 166, 544 A.2d 1185 (1988). Under this framework, a court first looks to determine whether the plaintiff alleges a public or a private duty. Plaintiffs here challenge defendants' policy of recording automatically all telephone calls, and do not allege defendants targeted specific individuals for recording. Plaintiffs thus allege a violation of a public duty.[20]

■■■ Second, "if a public duty exists, an official can be liable only if the act complained of is a ministerial act or [if] one of the narrow exceptions to discretionary acts applies." *Gordon,* 208 Conn. at 170, 544 A.2d 1185. A "ministerial act" is defined as "a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion." *Wright v. Brown,* 167 Conn. 464, 471, 356 A.2d 176 (1975); *cf. Gauvin v. New Haven,* 187 Conn. 180, 184, 445 A.2d 1 (1982) ("Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature."). Public officials can be found liable for the "negligent execution" of ministerial acts. *Wright,* 167 Conn. at 471, 356 A.2d 176. Since the defendants were under no prescribed duty to record their telephone lines, but instead possessed considerable discretion in determining the operation of their tele-

communications system generally, the acts complained of were discretionary, not ministerial.

■■ The three exceptions to the immunity conferred on public officials performing discretionary acts are as follows:

[F]irst, where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm; second, where a statute specifically provides for a cause of action against a municipality or municipal official for failure to enforce certain laws; and third, where the alleged acts involve malice, wantonness or intent to injure, rather than negligence.

*Evon v. Andrews,* 211 Conn. 501, 505, 559 A.2d 1131 (1989) (citations omitted). The second exception has no bearing on the facts of this case. Therefore, the Court's analysis of defendants' qualified immunity defense must determine whether plaintiffs' state law claims establish acts "likely to subject an identifiable person to imminent harm" or acts "involv[ing] malice, wantonness, or intent to injure." *See Burns v. Board of Education,* 228 Conn. 640, 638 A.2d 1, 3 (1994). The Connecticut Supreme Court has construed the former exception to apply not only to identifiable individuals but also to narrowly defined identified classes of foreseeable victims, *see id.; Sestito v. Groton,* 178 Conn. 520, 527–28, 423 A.2d 165 (1979), while the latter exception parallels the exception to sovereign immunity contained in section 4–165. Moreover, qualified immunity under Connecticut law does not serve as a defense to common law actions predicated on intentional torts. *See Mulligan,* 229 Conn. 716, 643 A.2d at 1232.[21]

In sum, neither the federal nor the state doctrines of qualified immunity are models of simplicity, and each requires a separate and

---

**20.** Since the public/private duty distinction merely initiates and does not control the assessment of qualified immunity under Connecticut law, this determination alone is not dispositive. *See Shore,* 187 Conn. at 153, 444 A.2d 1379 ("Policy considerations have also resulted in . . . certain exceptions which provide that an individual cause of action may be brought against an official for breach of duty without regard to whether the duty is technically a public or private one.").

**21.** Plaintiffs' common law claim of invasion of privacy therefore survives defendants' motion only if plaintiffs can establish at trial that the recording of their conversations constituted a "wanton, reckless or malicious" invasion of their privacy. This question will be discussed in greater detail below.

distinct analysis. Federal qualified immunity requires defendants to demonstrate that their actions did not violate "clearly established" rights, or that their actions were objectively reasonable. *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3038–39. The Connecticut doctrine, in contrast, does not immunize a public employee from suit for actions based on malice, as unlike federal law Connecticut employs a subjective standard. *See Mulligan*, 229 Conn. 716, 643 A.2d at 1234; *cf. Cartier v. Lussier*, 955 F.2d 841, 843–44 (2d Cir.1992) ("[A]n allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner.") (quotation omitted). Rather, as applicable to this case, to establish the affirmative defense of immunity under Connecticut law defendants must demonstrate that their acts neither were "likely to subject an identifiable person to imminent harm" nor "involved malice, wantonness, or intent to injure." *Burns*, 228 Conn. 640, 638 A.2d at 3. These standards will be applied to the various federal and state law claims asserted by plaintiffs.

## II. Constitutional Claims

### A. *Federal Constitution*

 Plaintiffs' constitutional claims arise under 42 U.S.C. § 1983,[22] which requires plaintiffs to establish that defendants are "persons" acting "under color of state law," and that defendants deprived plaintiffs of a right or privilege secured by the Constitution or the laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981). Further, section 1983 liability may not be premised upon negligence, but requires an intentional act. *Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986); *see also City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989) (proof of "deliberate indifference" to need for training necessary to establish liability of municipality under § 1983). Thus, a defendant violates a plain-

tiff's constitutional rights within the meaning of section 1983 by directly participating in the infraction, by failing to remedy a wrong while acting in a supervisory capacity, by creating a policy or custom under which unconstitutional practices occurred, or by allowing such a policy or custom to continue. A supervisory official also may be personally liable "if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event." *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted).

The individual defendants held supervisory positions in the State Police, and plaintiffs allege that the policies they designed and implemented violated the "rights, privileges and immunities secured to the plaintiffs by the First, Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution." Pltfs' Third Amended Complaint, Count II. The individual defendants do not contest that they acted under color of law and were personally involved in the recording practices alleged by plaintiffs. Rather, they contend that their recording practices did not violate any of plaintiffs' constitutional rights.

### 1. *First Amendment*

 Defendants first argue that plaintiffs cannot establish a First Amendment claim, as their recording practices neither prevented plaintiffs from speaking nor targeted specific communications based on their content. *See United States v. Bonfiglio*, 713 F.2d 932, 938 (2d Cir.1983) (rejecting First Amendment claim based on warrantless playing of tape recording of protected speech on finding that police did not play tape for purpose of determining its contents). Plaintiffs do not contest these conclusions, but assert in response that defendants' recording practices "chilled" the free exercise of their rights, thereby violating the First Amendment even in the absence of a direct prohibition on

---

**22.** 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to

the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

speech. *See Laird v. Tatum,* 408 U.S. 1, 11, 92 S.Ct. 2318, 2324, 33 L.Ed.2d 154 (1972) ("[C]onstitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights.") (citations omitted). For a claim alleging a "chilling effect" to be legally cognizable, a plaintiff must demonstrate that "he has sustained or is immediately in danger of sustaining a direct injury as the result of that action." *Id.* at 13, 92 S.Ct. at 2325 (citing *Ex parte Levitt,* 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937)); *see also Levin v. Harleston,* 966 F.2d 85, 89 (2d Cir.1992).

Plaintiffs point to two "chilling effects." First, plaintiffs assert that any members of the plaintiff class or subclass who may have known or suspected that their conversations were being recorded, but who were compelled to utilize recorded lines because unrecorded lines were unavailable, were not at liberty to speak freely. *See Spear v. West Hartford,* 954 F.2d 63 (2nd Cir.1992); *Davis v. Village Park II Realty Co.,* 578 F.2d 461 (2nd Cir.1978). Second, plaintiffs seek prospective injunctive relief restraining defendants from continuing to record private calls, and argue that to the extent they now have knowledge of defendants' recording practices, their ability to exercise their free speech rights will again be chilled unless prospective injunctive relief is granted.

Plaintiffs' first argument is at odds with the factual position they have taken throughout this lawsuit: that the recording of their telephone calls occurred without their knowledge.[23] Plaintiffs also do not refute defendants' contention that their recorders no longer tape outgoing calls, and in any case in passing the Recording Act in 1990 the Connecticut Legislature specifically prohibited the recording of telephone calls without notification. *See supra* note 40. Plaintiffs do not support either of their claims with evidence of a "specific present objective harm or a threat of specific future harm." *Laird,* 408 U.S. at 14, 92 S.Ct. at 2326. In short, plain-

tiffs "rely on mere speculation or conjecture as to the true nature of the facts," and thus fail to overcome defendants' motion on these claims. *See Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

*2. Fourth Amendment*

■■■■ Defendants next take issue with plaintiffs' claim that their recording practices violated plaintiffs' Fourth Amendment rights. The applicability of such rights "depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). The Fourth Amendment "protects people, not places," *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), and its purpose "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Municipal Court of San Francisco,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). This inquiry raises two issues: whether the individual exhibited a subjective expectation of privacy, and whether that expectation is one which society is prepared to recognize as reasonable. *See Smith,* 442 U.S. at 740, 99 S.Ct. at 2580. The determination of reasonableness requires a balancing of the need for the search against the severity of the invasion of personal rights, and courts must weigh "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish,* 441 U.S. 520, 558, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). This determination thus requires undertaking a case-by-case analysis. *See United States v. Chuang,* 897 F.2d 646, 649–50 (2d Cir.1990).

■■■■ Defendants first contest that plaintiffs subjectively expected their telephone calls to be private, given that plaintiffs made their calls from a barracks of the State Po-

**23.** Indeed, it is likely that success on this First Amendment claim would vitiate many of plaintiffs' other claims, as knowledge of the recording practices could be a sufficient basis for a finding of implied consent to that recording.

lice. This argument is belied, however, by the fact that both Commissioner Forst and Colonel Mulligan disavowed any knowledge of the extent of the recording practices of the State Police. If those in charge of the State Police can claim no subjective knowledge of the recording of outgoing calls, it must be expected that plaintiffs do likewise.

■ Defendants also argue that plaintiffs' expectation of privacy was unreasonable. Defendants rely on *People v. Canard*, 257 Cal.App.2d 444, 65 Cal.Rptr. 15 (2d Dist. 1967), *cert. denied*, 393 U.S. 912, 89 S.Ct. 231, 21 L.Ed.2d 198 (1968), in which the California Court of Appeals noted that "[i]t is common knowledge that special security precautions must be taken in police departments; those using the lines could reasonably expect that it could take the form of monitoring calls." *Id.* at 464, 65 Cal.Rptr. 15. *Canard* involved the recording of calls with the consent of one of the participants, however, and the other cases on which defendants rely similarly depend on a finding of express or implied consent. *See, e.g., United States v. Amen*, 831 F.2d 373 (2d Cir.1987) (holding consent could be implied where prisoners received four forms of notification of recording on institutional telephones, and thus prisoners had no reasonable expectation of privacy in conversations on those phones), *cert. denied*, 485 U.S. 1021, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988). Rather, where no consent exists, and where conversations consist of privileged communications between clients and their attorneys, an expectation of privacy is reasonable. *See Crooker v. United States Dept. of Justice*, 497 F.Supp. 500, 504 (D.Conn.1980). The surreptitious recording of unprivileged but private calls, if proven, involves an invasion of privacy that far out-

weighs defendants' proffered justifications. *See Bell*, 441 U.S. at 558, 99 S.Ct. at 1884. Ultimately, therefore, the determination of whether the plaintiffs' expectations of privacy were reasonable depends on proof of the absence of notice, a question of fact precluding summary judgment on plaintiffs' Fourth Amendment claims. *See Chuang*, 897 F.2d at 649–50.[24]

### 3. Fifth Amendment

■ The essence of the privilege against self-incrimination, as protected by the Fifth Amendment,[25] is "the requirement that the State which proposes to convict and punish an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." *Estelle v. Smith*, 451 U.S. 454, 462, 101 S.Ct. 1866, 1872, 68 L.Ed.2d 359 (1981) (quotation omitted). The privilege therefore "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." *Doe v. United States*, 487 U.S. 201, 207, 210, 108 S.Ct. 2341, 2347, 101 L.Ed.2d 184 (1988) (quoting *Schmerber v. California*, 384 U.S. 757, 761, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908 (1966)). Finally, the privilege guarantees an arrestee the right to remain silent and to consult an attorney prior to any police interrogation. *Miranda v. Arizona*, 384 U.S. 436, 467–79, 86 S.Ct. 1602, 1624–31, 16 L.Ed.2d 694 (1966). Under *Miranda* an "interrogation" involves not only actual questioning initiated by police officers, but its "functional equivalent," defined as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know

24. Defendants rely on *Smith v. Maryland*, 442 U.S. at 740, 99 S.Ct. at 2580, to analogize recording without listening to the use of pen registers, and claim that taping a conversation without listening does not constitute a Fourth Amendment search. The Supreme Court's decision in *Katz* established that the capture of telephone conversations is a search for purposes of the Fourth Amendment, *see* 389 U.S. at 351, 88 S.Ct. at 511, and the principles outlined in that decision appear to support a finding that the recording of private conversations is sufficient to implicate the Fourth Amendment. There is no need to resolve this issue, however, as there

exists a genuine factual issue whether State Police employees reviewed and listened to tapes of private conversations.

25. Plaintiffs also raise a due process claim under the Fifth Amendment, and concede that the analysis of this claim is virtually identical to that of a claim under the Due Process Clause of the Fourteenth Amendment. The Court's conclusions as to plaintiffs' Fourteenth Amendment due process claims, as discussed below, thus apply with equal force to their claims under the Fifth Amendment.

are reasonably likely to elicit an *incriminating response* from the suspect." *Pennsylvania v. Muniz*, 496 U.S. 582, 601, 110 S.Ct. 2638, 2650, 110 L.Ed.2d 528 (1990) (emphasis added).

Plaintiffs claim, based on the above principles, that defendants' recording practices constituted a policy designed to elicit such incriminating responses. Defendants argue, in response, that the recorded calls were not compelled for purposes of the Fifth Amendment, and that even if compelled, the Fifth Amendment is not triggered unless the State sought to use the information.

 Plaintiffs have established that the State Police provided arrestees and detainees with access to a telephone to call an attorney, family member or friend concerning their arrest, and it remains to be proved whether troopers did so knowing that the call would be secretly recorded. Drawing this inference in plaintiffs' favor, such recording would constitute the "functional equivalent" of interrogation because it would be known to be "reasonably likely to elicit an incriminating response." *Muniz*, 496 U.S. at 601, 110 S.Ct. at 2650. Further, the Fifth Amendment privilege applies not only to evidence which would support a conviction, but to "information which would furnish a link in the chain of evidence that could lead to prosecution, as well as evidence which an individual reasonably believes could be used against him in a criminal prosecution." *Maness v. Meyers*, 419 U.S. 449, 461, 95 S.Ct. 584, 592, 42 L.Ed.2d 574 (1975); *Weaver v. Brenner*, 40 F.3d 527, 535 (2d Cir.1994) ("[W]e hold that use or derivative use of a compelled statement at any criminal proceeding against the declarant violates that person's Fifth Amendment rights; use of the statement at trial is not required."). Whether such evidence was ever induced through the record-

ing of private calls, or was ever used derivatively in any criminal proceeding, are matters to be established at trial.[26]

### 4. *Sixth Amendment*

 In general, the Sixth Amendment right to counsel attaches "only at or after the time that adversary judicial proceedings have been initiated against [an accused] ... by way of formal charge, preliminary hearing, indictment, information or arraignment." *United States v. Gouveia*, 467 U.S. 180, 187–88, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146 (1984) (quotation omitted). This right extends, however, to certain critical pretrial proceedings at which the "the accused [is] confronted, just as at trial, by the procedural system, or by his expert adversary or by both." *United States v. Ash*, 413 U.S. 300, 310, 93 S.Ct. 2568, 2574, 37 L.Ed.2d 619 (1973); *see also United States v. Wade*, 388 U.S. 218, 224, 87 S.Ct. 1926, 1930, 18 L.Ed.2d 1149 (1967). A critical stage is one "where the absence of defense counsel or lack of advice might derogate from the accused's right to a fair trial." *United States v. Charria*, ·919 F.2d 842, 846 (2d Cir.1990). Finally, the Sixth Amendment protects the confidentiality of communications between an attorney and his or her client. *See United States v. Noriega*, 917 F.2d 1543, 1551 n. 9 (11th Cir.1990); *United States v. Rosner*, 485 F.2d 1213, 1224 (2d Cir.1973) ("[T]he essence of the Sixth Amendment right [to counsel] is, indeed, privacy of communication with counsel."); *see also Greater Newburyport Clamshell Alliance v. Public Serv. Co.*, 838 F.2d 13, 21 (1st Cir.1988). This protection of attorney-client communications applies, however, only where the communication was intended to remain confidential, and under the circumstances was reasonably expected and

---

26. Defendants chiefly rely on *United States v. Willoughby*, 860 F.2d 15 (2d Cir.1988), *cert. denied*, 488 U.S. 1033, 109 S.Ct. 846, 102 L.Ed.2d 978 (1989), for the proposition that a taped telephone conversation is not compelled for purposes of the Fifth Amendment if it is voluntarily made, can be cut off at any time, and is not initiated by the government. At issue in *Willoughby*, however, was whether the fact of imprisonment alone is sufficient to require that all conversations by a prisoner are necessarily offi-

cial interrogations, for which *Miranda* warnings must be required. The Second Circuit concluded that incarceration alone did not make a prisoner's statements involuntary, in a case where a prisoner's girlfriend, whom he summoned for the visit, taped a face-to-face conversation with him in cooperation with police. *See id.* at 17. Such facts differ significantly from the recording of a telephone call by an arrestee who reasonably believes that the call is private.

understood to be confidential. *Noriega,* 917 F.2d at 1551.

■ As with the Fifth Amendment privilege against self-incrimination, the above rights apply only to those members of the plaintiff class who were arrested or detained in anticipation of a more formal arrest. Defendants argue that these plaintiffs cannot claim the subject matter of their calls was meant to remain confidential, and that in any case any police intrusion caused by the recording was unintentional. As discussed above, however, a reasonable expectation of privacy might have existed. Moreover, defendants admit to taping all calls, to having no unrecorded lines available, and to directing arrestees to use recorded lines. Any resulting recording cannot be said to be inadvertent, and implicates the Sixth Amendment. *See State v. Ferrell,* 191 Conn. 37, 42, 463 A.2d 573 (1983) ("Eavesdropping by the police or their agents makes a mockery of the right to consult counsel before being interrogated.") (footnote omitted).

As to arrested plaintiffs, therefore, two significant issues remain for trial: whether the communications between arrestees and their attorneys were intended to remain confidential, and whether it was reasonable for these plaintiffs to expect such communications to be confidential. The question of whether any notification mechanisms (beep tones and warning labels) existed will be central to these inquiries.

### 5. Ninth Amendment

■ The Ninth Amendment provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." Plaintiffs assert that since courts have considered Ninth Amendment claims within the context of the Due Process Clause of the Fifth Amendment, a violation of the latter also constitutes a violation of the former. While the Ninth Amendment has been mentioned as one of the bases for the right to privacy, *see Griswold v. Connecticut,* 381

U.S. 479, 484, 85 S.Ct. 1678, 1681–82, 14 L.Ed.2d 510 (1965), the amendment does not guarantee any constitutional right sufficient to support a claim under 42 U.S.C. § 1983. *See, e.g., Gibson v. Matthews,* 926 F.2d 532, 537 (6th Cir.1991); *Strandberg v. City of Helena,* 791 F.2d 744 (9th Cir.1986). Accordingly, defendants' motion is granted as to plaintiffs' Ninth Amendment claim.

### 6. Fourteenth Amendment

To the extent plaintiffs have established claims pursuant to the Fourth, Fifth and Sixth Amendments, as discussed above, they have also established a claim under the Fourteenth Amendment. *See Wise v. Bravo,* 666 F.2d 1328, 1332 (10th Cir.1981). Plaintiffs argue, however, that defendants' conduct caused an independent violation of their due process rights.

■ Government action violates the Due Process Clause of the Fourteenth Amendment where the government deprives a person of a liberty interest. *See General Elec. Co. v. New York State Dept. of Labor,* 936 F.2d 1448, 1453 (2d Cir.1991).[27] The liberty interest at issue here is the right of personal privacy, "or a guarantee of certain areas or zones of privacy." *Carey v. Population Servs. Int'l,* 431 U.S. 678, 684, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977) (quotation omitted). Cases protecting this right have defined two specific types of privacy interests, "the individual interest in avoiding disclosure of personal matters, and ... the interest in independence in making certain kinds of important decisions." *Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977); *see also Barry v. New York,* 712 F.2d 1554, 1558–59 (2d Cir.), *cert. denied,* 464 U.S. 1017, 104 S.Ct. 548, 78 L.Ed.2d 723 (1983). Plaintiffs' claims fall under the first interest, the "confidentiality" branch of the privacy right. *See Barry,* 712 F.2d at 1558.

[42] The right to privacy is not violated unless an individual's interest in maintaining

---

**27.** Plaintiffs also allege, in a single sentence in their brief, that they possessed a Fourteenth Amendment property interest in the subject matter and content of their telephone conversations, arising by virtue of state constitutional protections. Plaintiffs fail to cite a single case or any other authority in support of this claim, and the Court therefore does not reach it.

confidentiality outweighs the government's interest in disclosure. *See Nixon v. Administrator of General Servs.*, 433 U.S. 425, 458, 97 S.Ct. 2777, 2797–98, 53 L.Ed.2d 867 (1977). Defendants argue that the State's interest in protecting public safety, as advanced by the capacity to verify emergency information, investigate crime and insure the proper conduct of police officers, outweighs plaintiffs' interest in keeping secret the fact that they placed calls from State Police barracks. Whether plaintiffs made such calls, however, is not the issue. Rather, plaintiffs' privacy claim rests on their interest in maintaining the confidentiality of the contents of such calls. No governmental interest advanced by defendants is sufficient to justify the recording of confidential conversations. *See Whalen*, 429 U.S. at 599, 97 S.Ct. at 876; *Barry*, 712 F.2d at 559. Of course, no such violation of this confidentiality interest occurred if plaintiffs' conversations took place with notice, a fact remaining for trial.

### 7. *Qualified Immunity*

■ Defendants argue that they are entitled to qualified immunity because no court previously has determined that recording practices similar to theirs violate any rights protected by the federal constitution. The test whether a particular right is "clearly established," however, does not require a previous holding on a specific violation. Rather, it is sufficient that the unlawfulness of the action was apparent "in the light of pre-existing law." *Ayeni*, 35 F.3d at 686. The qualified immunity defense does not protect defendants here.

Defendants ignore the Connecticut Supreme Court's decision in *State v. Ferrell*, 191 Conn. 37, 463 A.2d 573 (1983), a questionable omission given the import of that decision to their defense of qualified immunity. As discussed above, in *Ferrell* the Connecticut Supreme Court overturned an arrestee's conviction on the ground that his rights had been violated by State Police troopers. The troopers had listened in the same room to the arrestee's telephone conversations with his attorney, and testified at trial concerning the arrestee's statements. The court held that such eavesdropping violated the arres-

tee's rights against self-incrimination, right to counsel and due process right to a fair trial under the Fifth, Sixth and Fourteenth Amendments. *See id.*, 191 Conn. at 45, 463 A.2d 573. Although the recording of the telephone conversations was not introduced as evidence, and thus was not the focus of the court's analysis, the decision is directly applicable to the recording practices alleged in this case. For example, concerning an arrestee's Fifth Amendment rights, the court stated:

> [T]he right to consult a lawyer before being interrogated is meaningless if the accused cannot privately and freely discuss the case with that attorney. Such discussion is only possible under conditions free from eavesdropping by authorities. . . . [O]nce access [to an attorney] is provided, privacy must be assured.

*Id.* Further, the *Ferrell* Court explicitly based its holding on both the federal and Connecticut constitutions. *See id.* at 45 n. 12, 463 A.2d 573.

Significantly, the importance of the *Ferrell* decision was not lost on defendants. Mikulka wrote his memorandum to Major Nurse on the implications of the case the day after it was reported in the newspapers, and the decision caused Mikulka to conclude that "Police are obliged to provide a private telephone for accuseds to consult with their attorney." Pltfs' exh. 22. Further, Mikulka suggested specific remedial steps, including the provision of an unrecorded private line for use by arrestees, but no action was ever taken in response to his memorandum and Mikulka never pressed the issue. Defendants cannot successfully now argue that the constitutional rights in question were not "clearly established" after August 1983, and given the above facts it also was not objectively reasonable for defendants to believe that their actions did not violate those rights. *See Anderson*, 483 U.S. at 639, 107 S.Ct. at 3038–39; *see also Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law.").

This finding, however, does not resolve the question whether defendants were entitled to qualified immunity for constitutional violations occurring prior to the *Ferrell* decision, as well as those involving plaintiffs' Fourth Amendment rights and their privacy rights under the Fourteenth Amendment.

Notably, the Connecticut Supreme Court in *Ferrell* explicitly overruled *State v. Vennard*, 159 Conn. 385, 406–07, 270 A.2d 837 (1970), *cert. denied*, 400 U.S. 1011, 91 S.Ct. 576, 27 L.Ed.2d 625 (1971). *Vennard* upheld the admission of a police officer's testimony concerning a telephone conversation he overheard between the defendant and his attorney, based on an analysis of the attorney-client privilege. Although *Vennard* contained no discussion of constitutional due process, the *Ferrell* Court recognized that the holding in *Vennard*, if followed, would permit violations of the due process rights of arrestees. *See Ferrell*, 191 Conn. at 43 n. 6, 463 A.2d 573.

■ The *Vennard* decision was not based on a consideration of the federal constitution, however, under which the Fifth, Sixth, and Fourteenth Amendment rights asserted by plaintiffs previously were well defined. Since the Supreme Court's decision in *Maness v. Meyers*, 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975), it has been clear under federal law that Fifth Amendment protections extend to any testimonial or communicative evidence that "would furnish a link in the chain" leading to prosecution. *Id.* at 461, 95 S.Ct. at 592–93. Likewise, the Second Circuit has long held that the confidentiality of an arrestee's communication with his or her attorney is protected by the Sixth Amendment. *See, e.g., United States v. Rosner*, 485 F.2d 1213 (2d Cir.1973). These rights have long been applicable in state prosecutions because they are components of due process of law under the Fourteenth Amendment. *See Miranda*, 384 U.S. at 463–65, 86 S.Ct. at 1621–23; *Malloy v. Hogan*, 378 U.S. 1, 3, 84 S.Ct. 1489, 1490–91, 12 L.Ed.2d 653 (1964). Plaintiffs' rights under the Fifth, Sixth and Fourteenth Amendments thus were sufficiently "clearly established" throughout the class period.

■ Defendants also fail to establish the second prong of the qualified immunity doctrine. In 1978 the office of the Chief State's Attorney issued a "Manual on Wire Tapping" to the State Police. *See* pltfs' exh. H. The Manual specifically stated that "[a] call between a lawyer and a client presently the subject of criminal charges can under no circumstances be monitored," regardless of whether the police actually listened to the recording of the call. *Id.* at 32, 84 S.Ct. at 1506. No objectively reasonable police officer, so informed, would believe that the recording of conversations between arrestees and their attorneys was lawful under the Fifth or Sixth Amendments or the Due Process Clause of the Fourteenth Amendment.

There remains the constitutional claims of those members of the plaintiff classes who were not arrestees telephoning their attorneys—a significant portion. These plaintiffs' rights rest on the Fourth Amendment and on the right of privacy guaranteed by the Fourteenth Amendment. Since the Supreme Court's decision in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), it has been clear that the capture of private telephone conversations is a search for Fourth Amendment purposes:

> [T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.... One who occupies [a telephone booth], shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world. To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communications.

*Id.* at 351–52, 88 S.Ct. at 511–12 (citations omitted). Similarly, the confidentiality of private conversations falls under "the individual interest in avoiding disclosure of personal matters," and is therefore deserving of protection under the Fourteenth Amendment.

*Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977). The right of persons to keep private conversations confidential, in short, was "clearly established" prior to the class period such that a reasonable defendant would have understood that the recording of such conversations was unlawful. *See Jermosen,* 945 F.2d at 550.

■ The second element of the qualified immunity defense as to the rights of these plaintiffs rests on disputed issues of fact, precluding summary judgment. Defendants argue, in particular, that notification mechanisms were in place throughout the class period. If such mechanisms were actually implemented and maintained, it would be *objectively reasonable* for a police officer in defendants' position to believe that the recording of plaintiffs' private conversations occurred with their consent, and thus no Fourth or Fourteenth Amendment violation occurred. Since the facts relating to notification and plaintiffs' expectations of privacy remain at issue, however, summary judgment on these claims is inappropriate. *See Oliveira,* 23 F.3d at 649.

### B. *Connecticut Constitution*

Defendants do not engage in a substantive analysis of any of the claims asserted by plaintiffs under the Connecticut Constitution. Instead, defendants argue that the applicable state constitutional provisions protect the same rights as those protected by the federal constitution, and thus should be resolved similarly.

The United States Constitution establishes "a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." *Cologne v. Westfarms Assocs.,* 192 Conn. 48, 57, 469

A.2d 1201 (1984). Rather, in significant areas the Connecticut Supreme Court has construed the Connecticut Constitution to afford greater protections than those guaranteed under its federal counterpart, and that court has viewed seriously its obligation to interpret the Connecticut Constitution independently. *See, e.g., Horton v. Meskill,* 172 Conn. 615, 641–42, 376 A.2d 359 (1977) ("In the area of fundamental civil liberties ... we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut residents have come to expect as their due.").

Plaintiffs' state constitutional claims rest on entirely separate legal bases from their federal counterparts, yet defendants fail to direct any substantive arguments to them. Defendants fail to establish their entitlement to judgment as a matter of law, *see* Fed. R.Civ.P. 56(c), and accordingly defendants' motion is denied as to all of plaintiffs' state constitutional claims.

### III. Wiretap Claims

■ The individual defendants also move for summary judgment on plaintiffs' claims pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* (Title III),[28] and the Connecticut Wiretap and Electronic Surveillance Act, Conn.Gen.Stat. § 54–41a *et seq.* (State Wiretap Act).[29] Plaintiffs cross-move for partial summary judgment on the individual defendants' liability under these provisions, restricting their motion to the members of each of the approved classes "who

---

**28.** Plaintiffs also appear to seek injunctive and declaratory relief under Title III against all defendants. There is some question, however, whether such relief is available under that Act. *See Crooker v. United States Dep't of Justice,* 497 F.Supp. 500, 504 n. 4 (D.Conn.1980); *Campiti v. Walonis,* 453 F.Supp. 819, 825 (D.Mass.1978), *aff'd,* 611 F.2d 387 (1st Cir.1979); *see also* Sen. Rep. No. 1097, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Admin.News 2112, 2196 ("Injunctive relief ... is not intended to be available."). Since none of the parties has briefed the

question, and since it is not raised in the instant motion, the Court does not reach the issue.

**29.** Both plaintiffs' and intervening plaintiffs' Third Amended Complaints assert claims under the Federal Communication Act of 1934, 47 U.S.C. § 605 *et seq.* Any remedies provided by the Federal Communications Act, however, were superseded by Title III. *See Watkins v. L.M. Berry & Co.,* 704 F.2d 577, 580 (11th Cir.1983). Accordingly, plaintiffs' Federal Communications Act claims are dismissed.

participated in wire communications to, from, or within State Police facilities between January 20, 1987 and November 9, 1989 whose communications were recorded, but not necessarily listened to." Pltfs' Mot. at 1 n. 1.[30] The motions will be considered together, beginning with plaintiffs' federal claims.

### A. *Title III*

▮▮▮▮ Title III prohibits the interception of wire, electronic and oral communications except under limited circumstances, and establishes a civil cause of action for any violation.[31] Plaintiffs assert that defendants violated section 2511(1) of the Act, which states that any person who "intentionally intercepts,[32] endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication" will be liable for damages. Significantly, Title III excludes from its definition of "intercept" any communications received through a telephone component used "by an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a)(ii). Section 2520 of the Act in turn establishes the applicable remedies, which include equitable or declaratory relief, compensatory and punitive damages, and attorneys' fees. *See* 18 U.S.C. § 2520(b).[33] Finally, an intentional interception of a telephone conversation by a police officer is not actionable where one party to the conversation gave prior consent to the interception, *see* 18 U.S.C.

§ 2511(2)(c), and such consent need not be express, but can be inferred from the surrounding circumstances. *See United States v. Amen,* 831 F.2d 373, 378 (2d Cir.1987) (holding consent can be inferred where circumstances indicate that party knowingly agreed to surveillance), *cert. denied,* 485 U.S. 1021, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988).

To establish a violation of Title III, therefore, plaintiffs must prove three essential elements: the individual defendants (1) willfully or intentionally (2) intercepted or endeavored to intercept (3) a wire, oral or electronic communication without the callers' consent. Defendants, in contrast, seek to establish that the alleged interceptions occurred, if at all, through a telephone component used in the ordinary course of law enforcement duties, and that plaintiffs in any case consented to any ·interceptions. The parties contest the definitions and the applicability of these elements.

### 1. *Intentionality*

Defendants first assert that plaintiffs cannot establish the requisite level of intent under Title III. Specifically, defendants assert that the terms "willfully" (used in the 1986 version of Title III) and "intentionally" (as amended by the Privacy Act of 1986) each should be interpreted to require proof that their "conscious objective" was the aural acquisition of specific protected communications. Deft's Opp. at 31. Defendants argue

**30.** Plaintiffs leave to the Court to surmise that January 20, 1987 was chosen because it was the effective date of the Electronic Communications Privacy Act of 1986, Pub.L. No. 99–508, 100 Stat. 1848 (1986) (Privacy Act), which amended Title III. The importance of these amendments will be discussed in greater detail below. Plaintiffs also limit their motion to their claims against defendants Mikulka, Console and Mulligan, and do not explain the exclusion of the other individual defendants.

**31.** Section 2520 of the Act states:
Except as provided in section 2511(2)(a)(ii), any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate.
18 U.S.C. § 2520. Section 2511(2)(a)(ii) exempts from liability any person assisting in an

interception as directed by a court order or other specifically authorized interceptions, and thus is inapplicable to the facts of this case.

**32.** The Privacy Act amended this *mens rea* requirement from "willfully intercepts" to "intentionally intercepts." *See* Pub.L. No. 99–508, § 101(f), 100 Stat. 1853 (1986).

**33.** Section 2520(c)(2) of the Act defines compensatory damages as either the sum of the plaintiff's actual damages and the resulting profits earned by the violator, or statutory damages of the greater of $100 per day for each day of violation, or $10,000. Prior to passage of the Privacy Act, Title III prescribed liquidated damages of the greater of $100 per day for each violation or $1,000, and likewise provided for punitive damages and attorneys' fees. *See Kratz v. Kratz,* 477 F.Supp. 463, 467 (E.D.Pa.1979).

that plaintiffs cannot establish this element because they intended to intercept "only those calls which fell within the law enforcement exception [of Title III], and to destroy all other recordings without listening to them." Defts' Opp. at 32.

Defendants' interpret the scienter requirement too narrowly. Rather, the Second Circuit has defined the term "intentionally," as used in Title III, to mean "deliberately and purposefully: that is, defendant's act must have been the product of defendant's conscious objective rather than the product of mistake or accident." *United States v. Townsend*, 987 F.2d 927, 930 (2d Cir.1993); *see also Thompson v. Dulaney*, 970 F.2d 744, 749 (10th Cir.1992); *Bess v. Bess*, 929 F.2d 1332, 1334–35 (8th Cir.1991); *Shubert v. Metrophone, Inc.*, 898 F.2d 401, 405 (3d Cir.1990). Under this interpretation defendants' motive for the interception is irrelevant. *See Townsend*, 987 F.2d at 930. This interpretation also is consistent with the Second Circuit's reading of the prior term "willfully," which it defined as " 'an act which is intentional, or knowing, or voluntary, as distinguished from accidental.' " *Citron v. Citron*, 722 F.2d 14, 16 (2d Cir.1983) (quoting *United States v. Murdock*, 290 U.S. 389, 394, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933)).

The legislative history of the Privacy Act of 1986 supports this reading. For example, the Senate Report accompanying that Act noted that the change from "willfully" to "intentionally" was meant

> to underscore that inadvertent interceptions are not crimes under the Electronic Communications Privacy Act.

> As used in the Electronic Communications Privacy Act, the term "intentional" is narrower than the dictionary definition of "intentional." "Intentional" means more than that one voluntarily engaged in conduct or caused a result. Such conduct or the causing of the result must have been the person's conscious objective.

*See* Sen.Rep. No. 99–541, 99th Cong., 2d Sess., *reprinted in* 1986 Code Cong. & Admin.News 3555, 3577; *see also id.* at 3578 ("The term 'intentional' is not meant to connote the existence of a motive. Liability for intentionally engaging in prohibited conduct is not dependent on an assessment of the merit of the motive that led the person to disregard the law....").

It is uncontested that the State Police purchased and installed the recorders with the intent to record automatically all telephone communications into and out of all barracks, and it cannot be said that the recording of such communications was "inadvertent." Plaintiffs therefore have established this element for the entire class period.

### 2. Interception

The second element of a section 2520 violation is that a wire, oral, or electronic communication must be intercepted. The statute defines "intercept" to mean "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). Plaintiffs argue that the recording of a telephone conversation alone is sufficient to establish an interception. Defendants do not deny that they recorded telephone lines. Rather, they argue that plaintiffs cannot establish a violation of Title III because the tapes were heard only to the extent necessary to meet emergency and administrative needs, uses which they contend fall within the Act's exception for legitimate law enforcement activities.

As an initial matter it appears obvious that the defendants' actions often resulted in "interceptions" under any definition of that term. To determine whether the recording of a particular call was needed for emergency or administrative reasons, and hence whether it was an exempt recording under the law enforcement exception, the State Police would delegate a trooper to listen to all calls in a given time period. It is undisputed that the State Police's recorders did not possess the capability to locate a particular call automatically. Even under the defendants' proposed interpretation of "interception," therefore, defendants "aurally acquired" plaintiffs' conversations whenever they listened through tapes searching for particular calls. What specific tapes were listened to, and

which conversations were therefore "intercepted," as defendants interpret that term, thus would appear to be issues of material fact precluding summary judgment in defendants' favor.

Plaintiffs' motion, of course, goes further. Under the plaintiffs' interpretation a conversation is "intercepted" when it is diverted and recorded by a recording device, as at that moment a communication containing the human voice has been isolated and possessed ("aurally acquired") and can be heard by the human ear. Plaintiffs argue that a telephone conversation that is recorded, but not necessarily listened to, is still an "interception" under the Act.

The terms of the statute itself support plaintiffs' interpretation. If Congress had intended the phrase "aural or other acquisition" to mean "overheard," it certainly could have employed the simpler term. The section's additional requirement that a conversation be acquired "through the use of any electronic, mechanical, or other device" suggests that it is the act of diverting, and not the act of listening, that constitutes an "interception." *See also* 18 U.S.C. § 2510(5) (defining "electronic, mechanical, or other device" as "any device or apparatus which can be used to intercept a wire, oral, or electronic communication"); 18 U.S.C. § 2510(18) (defining "aural transfer" as "a transfer containing the human voice at any point between and including the point of origin and the point of reception"). While it may appear this interpretation reaches too broadly, legitimate "interceptions" are protected from liability by the Act's exemptions for interceptions made using a telephone extension, during the ordinary course of a service provider's business, or by law enforcement officers

in the ordinary course of their duties. *See* 18 U.S.C. § 2510(5)(a). This interpretation also is consistent with the legislative history.[34]

Defendants' proposed interpretation, in contrast, leads to bizarre results. If an interception occurs only when a defendant actually listens to a recorded conversation, a violation of the Act could occur on every subsequent occasion when that recording is replayed. This cannot be what Congress intended. *See United States v. Turk*, 526 F.2d 654, 658 (5th Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976).[35] Thus while the Act does not precisely define what an interception is, it must be deemed to have occurred "when the contents of wire communications are captured or redirected in any way." *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir.) (holding both location where conversation was redirected and where it was overheard sufficed as situs of "interception" for jurisdictional purposes), *cert. denied*, —— U.S. ——, ——, ——, 113 S.Ct. 139, 140, 663, 121 L.Ed.2d 92, 588 (1992); *United States v. Shields*, 675 F.2d 1152, 1156 (11th Cir.) (holding interception occurred both when law enforcement officers overheard conversation transmitted by radio and when recording of that conversation was made, but not when persons listened to tape of that conversation), *cert. denied*, 459 U.S. 858, 1015, 103 S.Ct. 130, 373, 74 L.Ed.2d 112, 508 (1982); *see also United States v. Nelson*, 837 F.2d 1519, 1527 (11th Cir.), *cert. denied*, 488 U.S. 829, 109 S.Ct. 82, 102 L.Ed.2d 58 (1988); *Jacobson v. Rose*, 592 F.2d 515, 522 (9th Cir.1978); *United States v. Burford*, 755 F.Supp. 607, 611 (S.D.N.Y.1991). Therefore, since "redirection presupposes interception," *Rodriguez*, 968 F.2d at 136, the recording of

---

**34.** The legislative history does not detail the meaning of "interception." In discussing § 2510, however, the Senate Report on Title III focuses on the act of surveillance, and not the "aural acquisition" or hearing, of a conversation: "Paragraph (4) defines 'intercept' to include the aural acquisition of the contents of any wire or oral communication by any electronic, mechanical, or other device. *Other forms of surveillance* are not within the proposed legislation." S.Rep. No. 1097, 90th Cong., 2d Sess. (emphasis added), *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2178. This is consistent with the general purpose underlying the Act of establishing sanc-

tions to deter illegal invasions of privacy through wiretapping. *See id.* at 2156.

**35.** The *Turk* Court aptly posed and resolved this metaphysical dilemma as follows:

> In a forest devoid of living listeners, a tree falls. Is there a sound? The answer is yes, if an active tape recorder is present, and the sound might be thought of as "aurally acquired" at (almost) the instant the action causing it occurred. For § 2510(4) purposes, the recorder can be the agent of the ear.
> *Turk*, 526 F.2d at 658 n. 2.

telephone lines in the State Police barracks constituted an "interception" under Title III.

### 3. Exception for Telephone Component Used in Course of Law Enforcement Duties

The parties do not contest that the telephone conversations recorded by the State Police constituted "wire, oral, or electronic communication[s]" under Title III. *See* 18 U.S.C. § 2511. Further, as discussed above, the Court rejects defendants' argument that all users of State Police telephones received notice of the recording system, and finds a genuine issue of material fact exists as to whether plaintiffs' consent to the recording can be implied. *See supra* p. 1249. The Act states, however, that intentional interceptions are only unlawful if they occur through an "electronic, mechanical or other device," and the Act exempts from this element any "telephone or telegraph instrument, equipment or facility, or any component thereof," which is used "by an investigative or law enforcement officer in the ordinary course of his duties." [36] 18 U.S.C. § 2510(5)(a). Defendants argue this exception applies to their recording systems.

▆▆▆ The parties first disagree on whether the recording system was a "component" of "telephone equipment." Plaintiffs contend that the exception does not apply to the State Police recorders because they were not provided, installed or serviced by the telephone company. Plaintiffs further argue that because the telephone lines could be used regardless of whether the recorders were tapping, the recorders were not "integral components" of any telephone equipment. Finally, plaintiffs argue that the recorders cannot be considered telephonic components because the couplers or "punch blocks," which connected the recorders to the telephone lines, demarcated the separate responsibilities of the telephone companies and the State Po-

lice. Plaintiffs generally assert that, to advance Title III's legislative purpose, the Court should narrowly construe the law enforcement exception. *See United States v. Giordano*, 416 U.S. 505, 514, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974) (noting that since Title III contains considerable detail, Congress intended that deviations from its strict terms not be permitted).

The facts of this case, however, construed in plaintiffs' favor, fail to undermine the conclusion that defendants' recorders constituted telephonic "components." The systems were attached permanently to telephone lines and were designed to operate automatically. If interpreted as plaintiffs suggest, no recording system used for taping emergency calls would fall under the law enforcement exception, a result Congress did not intend. *See Epps v. St. Mary's Hosp., Inc.*, 802 F.2d 412, 416 (11th Cir.1986); *Anonymous v. Anonymous*, 558 F.2d 677, 679 (2d Cir.1977); *see also Jandak v. Brookfield*, 520 F.Supp. 815, 822 (N.D.Ill.1981) ("[I]t is clear from the language of the exception that it exempts more than just extension telephones.").

▆▆▆ It is far more questionable, however, whether the automatic recording of all outgoing as well as incoming telephone calls should be considered to be within the "ordinary course of [law enforcement] duties." Defendants argue the exception applies because their recording practices advanced four legitimate law enforcement purposes:

[T]o permit the police to be able to play back emergency calls in order to recall or retrieve necessary information, such as an address; to permit police supervisory personnel to investigate complaints of improper police response; to use in major criminal investigations, such as to establish the time sequence and contents of telephoned reports of crime; and for quality control purposes, to ensure that troopers were

---

36. Section 2510(5) states in pertinent part:
"[E]lectronic, mechanical or other device" means any device or apparatus which can be used to intercept a wire, oral, or electronic communication other than—
(a) any telephone or telegraph instrument, equipment or facility, or any component thereof, .... (ii) being used by a provider of

wire or electronic communication service in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties[.]
18 U.S.C. § 2510(5). This provision was amended in several minor respects, none relevant here, by the Privacy Act of 1986.

dealing with callers courteously and appropriately.

Defts' Mem. at 5 (footnote omitted). These purposes are inadequate for several reasons. First, it is uncontested that no unrecorded lines were ever designated for calls to attorneys or family members by detainees, or for personal calls by State Police employees. The recording of privileged or private outgoing calls cannot be justified under any of the four rationales offered by defendants themselves. Second, contrary to defendants' position, the applicability of the law enforcement exception must be determined not only by reference to the purpose for the interception, but also to the character of the conversation intercepted. While the practice of recording calls in a police department generally may fall within the terms of the exception, the interception of private or privileged calls cannot. This conclusion is supported by cases interpreting section 2510(5)(a)(i), the parallel exception for interceptions made in the ordinary course of business. *See, e.g., Watkins v. L.M. Berry & Co.*, 704 F.2d 577 (11th Cir.1983) (holding monitoring of worker's personal call not within company's ordinary course of business); *Briggs v. American Air Filter Co.*, 630 F.2d 414, 420 n. 8 (5th Cir. 1980) ("[I]t is hard to see how use of an extension telephone to intercept a call involving non-business matters could be 'in the ordinary course of business,' since such activity is unlikely to further any legitimate business interest."); *United States v. Harpel*, 493 F.2d 346, 351 (10th Cir.1974); *Gerrard v. Blackman*, 401 F.Supp. 1189 (N.D.Ill.1975) (holding hospital's surreptitious monitoring of patient's call to attorney was not within ordinary course of business).

What these and other cases found dispositive, and what none of the parties in this case has established, is whether each caller who made a private or privileged telephone call received notice that the conversation was recorded. The Act exempts from coverage any interception made with the consent of one of the participants,[37] and such consent can be implied. *See Amen*, 831 F.2d

at 378. As discussed above, it is unclear to what extent the beep tones worked on recorded lines, while the warning labels appear to have been inadequately distributed and maintained. Indeed, the absence of beep tones was noted specifically by the Connecticut Supreme Court in *Ferrell*, 191 Conn. at 39 n. 2, 463 A.2d 573, while the tape recording introduced in the *Little* case likewise revealed the absence of a beep tone. *See supra* pp. 1244–45, 1246. Plaintiffs therefore have established sufficient evidence of an absence of either knowledge or notification, without which consent cannot be implied. *See Amen*, 831 F.2d at 378.

The law enforcement exception does not exempt from liability the recording of private or privileged conversations where neither caller consented to the recording. *See Harpel*, 493 F.2d at 351 ("We hold as a matter of law that a telephone extension used without authorization or consent to surreptitiously record a private telephone conversation is not used in the ordinary course of business."); *George v. Carusone*, 849 F.Supp. 159, 164 (D.Conn.1994); *cf. United States v. Sababu*, 891 F.2d 1308, 1329 (7th Cir.1989) (holding interception was within law enforcement exception where prisoners were notified that calls were monitored); *Crooker v. United States Dep't of Justice*, 497 F.Supp. 500 (D.Conn.1980) (holding routine and random monitoring of prison inmate calls pursuant to notice and published regulations was within law enforcement exception). Since the surreptitious recording of private or privileged conversations does not fall within the law enforcement exception, the interception of such calls would be in violation of Title III.

### 4. *Qualified Immunity*

Defendants argue that the Title III rights asserted by plaintiffs were not clearly established at the time defendants acted. In particular, defendants assert that the precise definition of "aural acquisition" under the Act was not established until the Second Circuit decided *Rodriguez* in 1992, and that the lim-

---

**37.** 18 U.S.C. § 2511(c) states: "It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."

its of the law enforcement exception remained unclear throughout the class period. Defendants also argue that, even if the Court determines plaintiffs' Title III rights were clearly established, it was objectively reasonable for defendants to believe that their actions did not violate those rights.

■ Although the doctrine of qualified immunity does not require a defendant "to anticipate subsequent legal developments," *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738, the requirement that a right be "clearly established" does not mean that "the very action in question has previously been held unlawful." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039; *see also Cleveland–Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir.1989) ("The presence of a controlling precedent is not ... a *sine qua non* of a finding that a particular right has been clearly established...."), *cert. denied*, 498 U.S. 949, 111 S.Ct. 368, 112 L.Ed.2d 331 (1990). Rather, all that is required is that, "in the light of pre-existing law the unlawfulness [of the act] must be apparent." *Ayeni*, 35 F.3d at 686. As discussed above, Title III's definition of "interception" as the "aural acquisition" of a conversation does not require that a recording actually be overheard, and the terms and purposes of the Act do not support the latter interpretation. *See supra* pp. 1263–65; *see also Turk*, 526 F.2d at 658. Further, as noted above, even if the Act requires recordings to be heard by human ears for an interception to occur, it remains a question of fact whether defendants listened to protected conversations while reviewing tapes for other purposes.

■ Defendants likewise fail to establish that the limits of the law enforcement exception, as applied to their recording practices, were not clearly defined. Defendants' proffered justifications for those practices do not apply to the recording of outgoing privileged or private telephone conversations. Defendants cannot plausibly argue that Congress intended the recording of privileged or private conversations in violation of the Constitution, as alleged in this case, to fall under Title III's definition of "law enforcement duties." [38] In sum, plaintiffs' rights under Title III were defined adequately by court decisions and the Act itself during the period in question, and a reasonable official in defendants' position would have understood that the acts alleged by plaintiffs were unlawful under Title III. *See Jermosen*, 945 F.2d at 550.

■ Defendants also fail to establish the second prong of the qualified immunity inquiry, that it was objectively reasonable for defendants to believe that their acts did not violate plaintiffs' Title III rights. *See Oliveira*, 23 F.3d at 648. As discussed above, defendants themselves appear to have understood the *Ferrell* decision to require the protection of the privacy of arrestees' telephone conversations with their attorneys, *see supra* p. 1245, and it would not be objectively reasonable for officials in defendants' positions to believe that the recording of arrestees' conversations nonetheless did not violate Title III. Likewise, the 1984 opinion letter from the Connecticut Attorney General's office stated unequivocally that the State Police "may not intercept wire communication without a warrant." Although the opinion letter concerned electronic surveillance during terrorist situations, the letter advised defendants that a judicial order was required without exception for all wiretaps. [39] The Chief

---

**38.** Congress intended Title III to "meet the constitutional requirements for electronic surveillance enunciated by [the Supreme] Court in *Berger v. New York*, 388 U.S. 41 [87 S.Ct. 1873, 18 L.Ed.2d 1040] (1967), and *Katz v. United States*, 389 U.S. 347 [88 S.Ct. 507, 19 L.Ed.2d 576] (1967)." *Mitchell v. Forsyth*, 472 U.S. 511, 532, 105 S.Ct. 2806, 2818, 86 L.Ed.2d 411 (1985) (quotation omitted). A violation of the Fourth Amendment standards set forth in *Katz*, for example, if proven by plaintiffs, therefore would not fall under the definition of official duties exempted from liability under Title III by the law enforcement exception.

**39.** The Attorney General's opinion letter specifically concluded that there was no exception to the requirement that all wiretaps receive prior judicial approval:

Connecticut law prohibits the interception of wire communication without a court order.... We find no exception to these provisions. Moreover, only a good faith reliance on a court order constitutes a complete defense to a *civil* or criminal action brought pursuant to Connecticut law. We conclude that Connecticut Statutes prohibit you from intercepting a wire

State's Attorney's Manual on Wire Tapping, prepared in 1978, placed defendants on notice that privileged calls could not be intercepted prior to the class period. Finally, defendants admit that they attempted to place beep tones on recorded lines when they first initiated recording, thereby acknowledging a duty not to record conversations without notification. This acknowledgement is sufficient to raise the question whether it was objectively reasonable for defendants to believe, throughout the class period, that their recording practices did not violate plaintiffs' Title III rights, given the factual issue whether working beep tones existed on all recorded lines. Defendants therefore fail to establish their qualified immunity defense at this time.

### B. State Wiretap Act

#### 1. Substantive Claims

 Plaintiffs also claim defendants' recording practices violated the State Wiretap Act. This Act was enacted in 1971 and was patterned after Title III, see Crooker, 497 F.Supp. at 504 n. 5, and generally establishes the mechanism whereby a prosecutor may obtain an order authorizing the interception of any wire communication by law enforcement officers. See Conn.Gen.Stat. § 54–41b.

communication even in the emergency situations you have described to us.
See pltfs' exh. 26, ¶ 4 (emphasis added). While the letter reached this conclusion explicitly under the State Wiretap Act, not Title III, the State Wiretap Act tracks the federal statute in all significant respects. Thus a reasonable official in defendants' positions would have understood the letter's conclusions also to apply to plaintiffs' rights under Title III.

40. The provision's citation to "sections 53–187 to 53a–189, inclusive" refers to the eavesdropping provisions of the 1969 Penal Code, 1969 Conn. Pub.Acts No. 828, §§ 189–91 (Eavesdropping Statute). The Eavesdropping Statute establishes criminal sanctions for eavesdropping in terms substantively identical to Title III. For example, section 53–187(a)(1) defines "wiretapping" as "the intentional overhearing or recording of a telephonic or telegraphic communication ... by a person other than a sender or receiver thereof, without the consent of either the sender or receiver, by means of any instrument, device or equipment." Conn.Gen.Stat. § 53–187(a)(1); cf. 18 U.S.C. § 2510(4).
 The Connecticut legislature added a third provision governing recording of telephone lines in

Like Title III, the State Wiretap Act also provides a civil cause of action and statutory damages:

> Any person whose wire communication is intercepted, disclosed or used in violation of this chapter or of sections 53a–187 to 53a–189, inclusive, shall (1) have a civil cause of action against any person who intercepts, discloses or uses, or procures any other person to intercept, disclose or use, such communication, and (2) be entitled to recover from any such person actual damages but not less than liquidated damages computed at the rate of one hundred dollars per day for each day of violation or one thousand dollars, whichever is higher; punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

Conn.Gen.Stat. § 54–41r.[40] Finally, the Act prohibits all interceptions not authorized by a judicial panel. See Conn.Gen.Stat. § 54–41b. The Act defines "interception" as "the intentional overhearing or recording[41] of a wire communication through the use of any electronic, mechanical or other device," Conn. Gen.Stat. § 54–41a(2), and also creates an ordinary course of business exception:

1990. See An Act Concerning the Recording of Telephone Conversations, 1990 Conn.Acts No. 90–305, codified at Connecticut General Statutes § 52–570d (Recording Act); see generally Washington v. Meachum, 1995 WL 127823, *17–24, 1995 Conn.Super. LEXIS 849, *44–62 (Conn. Sup.Ct.1995) (discussing relationship among the State Wiretap Act, the Eavesdropping Statute, and the Recording Act). Since the Recording Act does not expressly apply retroactively, it is inapplicable to plaintiffs' claims. See Nagle v. Wood, 178 Conn. 180, 186, 423 A.2d 875 (1979) (holding substantive legislation is not applied retroactively absent a clearly expressed legislative intent to that effect). The Recording Act prohibits the recording of a telephone conversation without the knowledge and consent of all parties, unless the recording is proceeded by a verbal notification to the parties, or unless the recording is accompanied by a beep tone at 15–second intervals. See Conn.Gen.Stat. § 52–570d(a).

41. The addition of the term "recording" in this definition of "interception" distinguishes the State Wiretap Act from Title III, and renders the former directly applicable to defendants' recording practices.

"Electronic, mechanical or other device" means any device or apparatus which can be used to intercept a wire communication other than (A) any telephone or telegraph instrument, equipment or facility, or any component thereof (i) furnished to the subscriber or used [42] by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business. . . .

Conn.Gen.Stat. § 54–41a(3).[43]

▇ Thus the State Wiretap Act requires proof of the same essential elements as Title III, and the parties agree that it should be interpreted similarly. *State v. Assuntino,* 180 Conn. 345, 351, 429 A.2d 900 (1980) (noting that State Wiretap Act lies in "close proximity" to Title III, and concluding that it is proper to look "to federal interpretation for guidance in determining an appropriate state standard"); *see also State v. Grant,* 176 Conn. 17, 25, 404 A.2d 873 (1978); *State v. De Martin,* 171 Conn. 524, 534–45, 370 A.2d 1038 (1976). Defendants' recording practices therefore also fall under the State Wiretap Act. *See Crooker,* 497 F.Supp. at 504 n. 5 ("[T]he Court concludes, in view of the fact that the [State Wiretap Act] was patterned after, and, indeed, tracks in many respects, the federal statute, that the analysis set forth concerning the applicability of Title III, *supra,* applies with equal force to the Connecticut statute.").

[61] Plaintiffs raise two additional arguments concerning the applicability of the ordinary course of business exception under state law. Unlike Title III, the State Wiretap Act requires that, for the exception to be applicable, the telephone equipment or component must be "furnished to the subscriber or use[r] by a communications common carrier." Conn.Gen.Stat. § 54–41a(3). Plaintiffs

first argue that since neither the Stancil nor the Dictalog recorders were provided to defendants by a communications common carrier, the exception does not apply. This reading unnecessarily constricts the provision, however, since the telephone companies supplied the necessary telephones to which the recorders were directly attached. *See Epps v. St. Mary's Hospital, Inc.,* 802 F.2d 412 (11th Cir.1986); *United States v. Harpel,* 493 F.2d 346 (10th Cir.1974). Although the State Wiretap Act has not been amended to clarify that equipment need not be provided by the telephone company, unlike Title III,[44] the Connecticut Supreme Court has noted that telephone equipment bought from other vendors satisfies the requirement. *See State v. McVeigh,* 224 Conn. 593, 617–18, 620 A.2d 133 (1993) (holding that § 54–41a(1) of the State Wiretap Act, which requires that applicable telephone equipment be "furnished or operated by . . . a common carrier," should not be construed so narrowly as to excluded telephone equipment purchased from other vendors).

▇ Secondly, and more significantly, plaintiffs argue that defendants' recording practice was not in the ordinary course of business of the State Police. The Connecticut Supreme Court has noted that the recording of emergency calls is a common police practice because it is "the fastest and most accurate method of logging such calls, and permits the monitor of the call to concentrate on the needs of the caller rather than on writing down the message." *State v. Cain,* 223 Conn. 731, 741, 613 A.2d 804 (1992) (holding statutes governing preservation and disclosure of prior statements by witnesses in criminal trials do not apply to recordings of 911 calls made by such witnesses). In no case, however, has the Connecticut Supreme Court directly addressed the recording of private or privileged outgoing calls. *See, e.g.,*

---

**42.** This word, as defendants note, probably is a typographical error in the statute. To match Title III, on which the provision is based almost verbatim, and to be consistent with the remainder of the provision, this term should instead be "user."

**43.** Section 53a–187(b) of the Eavesdropping Statute also specifically excludes all wiretapping "by criminal law enforcement officials in the

lawful performance of their duties," but this exception expressly applies only to the criminal sanctions set forth in sections 53a–188 and 53a–189.

**44.** The Privacy Act of 1986 amended Title III to make clear that equipment need not be provided by a common carrier for the exception to apply. *See* 18 U.S.C. § 2510(5)(a)(i).

*State v. Santangelo,* 205 Conn. 578, 587, 534 A.2d 1175 (1987) (noting "long-standing" practice of New Haven police to record emergency calls); *State v. Myers,* 193 Conn. 457, 466, 479 A.2d 199 (1984) ("[I]t was the practice of the police department routinely to record all *in-coming* telephone calls, to retain the tape cassettes for approximately thirty to sixty days and then to erase and reuse them.") (emphasis added). As discussed above, none of defendants' proffered purposes for their recording practices suffice to justify the recording of private or privileged conversations. Accordingly, the ordinary course of business exception does not protect defendants from liability under the State Wiretap Act.

### 2. *Qualified Immunity*

As discussed above, to establish qualified immunity under Connecticut law defendants must demonstrate that their recording practices neither were "likely to subject an identifiable person to imminent harm" nor "involved malice, wantonness, or intent to injure." *Burns,* 228 Conn. 640, 638 A.2d at 3. Further, defendants must establish that they had no knowledge of the specific harm or injury alleged. *See id.*

Defendants fail to demonstrate their defense of qualified immunity under state law for the reasons stated in the Court's discussion of federal qualified immunity. While it is true, as defendants note, that the Connecticut Supreme Court has never explicitly assessed the practices alleged here, the *Ferrell* decision and the Attorney General's 1984 opinion letter, in particular, informed defendants that the recording of private or privileged telephone conversations would violate the federal and State constitutions and the State Wiretap Act. Whether defendants' actions also involved "malice, wantonness, or intent to injure," given defendants' decision to remove the beep tones from recorded lines, remains a question of fact for trial.

## IV. State Common Law Claim: Invasion of Privacy

█ Connecticut has adopted the four forms of invasion of privacy set forth in the Restatement (Second) of Torts. *See Venturi*

*v. Savitt, Inc.,* 191 Conn. 588, 591, 468 A.2d 933 (1983); *Goodrich v. Waterbury Republican–American, Inc.,* 188 Conn. 107, 127–28, 448 A.2d 1317 (1982); *see also Vorvis v. Southern New England Tel. Co.,* 821 F.Supp. 851, 856 (D.Conn.1993). Plaintiffs assert the form most relevant to this case is invasion of privacy by unreasonable intrusion upon the seclusion of another, which is defined as follows:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable man.

*Venturi,* 191 Conn. at 591, 468 A.2d 933 (citing Restatement (Second) of Torts, § 652B). Defendants argue that their recording practice did not intrude upon plaintiffs' seclusion, and thus no invasion of their privacy occurred, because no private conversation was actually overheard. In the alternative, defendants argue that any conversations actually overheard did not violate plaintiffs' privacy, because the troopers overhearing such conversations believed they had legal permission to do so and thus they lacked the necessary intent to commit the intrusive act.

There is considerable dispute, among the courts that have considered the question, whether a claim of intrusion upon solitude based on a recorded telephone call requires proof that the defendant listened to the recording. *Compare Marks v. Bell Telephone Co.,* 460 Pa. 73, 331 A.2d 424 (1975) (holding invasion of privacy claim required proof that recorded conversation had been overheard) *with Hamberger v. Eastman,* 106 N.H. 107, 206 A.2d 239 (1964) (holding no proof of listening required). It is persuasive that "[o]ne's seclusion may be as much disrupted by the presence of an electronic ear in a setting where one would normally expect to be alone as it is by the presence of a human ear in the same place." *Marks,* 460 Pa. at 90, 331 A.2d 424 (Pomeroy, J., concurring). Likewise, the question of whether a recorded conversation actually has been listened to appears more relevant to the amount of dam-

ages than to liability. *Id.* There is no need to resolve this issue, however, as there exists a genuine issue whether, and to what extent, employees of the State Police reviewed and listened to tapes of private conversations.

■ Although the question of defendants' intent at first appears a closer issue, it too presents a genuine issue of material fact. If defendants believed they had legal authority to listen to recorded conversations, they could not have intended to violate plaintiffs' privacy. Significantly, however, as discussed in detail above, none of defendants' four justifications for their recording practices provide any legal support for the recording of private conversations. Plaintiffs therefore have established a question whether defendants in fact knew the recording of private conversations was not supported by any lawful justification, yet decided to continue recording such calls. Since proof of such an intent would establish that defendants acted with "malice, wantonness, or intent to injure," *Burns*, 228 Conn. 640, 638 A.2d at 3, defendants also fail to demonstrate that they are protected by qualified immunity. Accordingly, defendants' motion is denied as to plaintiffs' state common law claims.

## V. Motions of Individual Plaintiffs

Several individual plaintiffs also filed motions on the legal issues discussed above, each arguing that their cases contain distinctive facts. These motions are resolved as follows.

A. *Jeffrey Fluery and Glenn Coe v. Lester J. Forst, et al.,* Civ. No. N–90–987 (TFGD). Plaintiffs Fluery and Coe join in the class motion for partial summary judgment, asserting that no material issue of fact exists as to their claims. Fluery was arrested by the State Police on a motor vehicle violation on January 24, 1989, and he telephoned Coe, his attorney, from the Stafford Springs Barracks. The arrest report states that Fluery made this call, which allegedly was recorded. While these facts may be undisputed, Fluery and Coe's motion fails as a matter of law for the reasons stated above, and accordingly this motion [# 1589] is denied.

B. *William Pagoni v. Lester J. Forst, et al.,* Civ. No. 3:92CV00039 (TFGD). Intervening plaintiff Trooper William Pagoni also joins in the class motion for partial summary judgment. Pagoni represents a somewhat unique litigant, in that he was named originally as a defendant in the case. The Court's December 24, 1991 filed Ruling excluded Pagoni from membership in the subclass of State Police employees. On January 27, 1992, however, Pagoni filed an individual action which was incorporated into the consolidated case, and Pagoni subsequently was dismissed as a defendant on May 4, 1993. Pagoni's claims are essentially identical to those asserted by the subclass of State Police employees, and his motion for partial summary judgment [# 1597], which incorporates plaintiff's motion, likewise is denied.

C. *Antony Galazan v. Lester J. Forst, et al.,* Civ. No. N–90–387 (TFGD). Plaintiff Antony Galazan joins in plaintiffs' motion for partial summary judgment, and advances additional arguments. Galazan's claims arise from his visit on July 24, 1989 to a State Police barracks to undergo a polygraph examination. Prior to the examination Galazan was led from the polygraph examination room to another office to telephone his attorney. Detective Joseph Palombizio, the polygraph examiner, gave Galazan a list of questions that Palombizio would ask in the examination, to enable Galazan to discuss the questions with his attorney. Palombizio then left Galazan alone in the room while he made the call. Galazan alleges that, unbeknownst to him, the polygraph machine recorded his side of the conversation. Galazan asserts that he did not consent to the recording, reasonably expected the conversation with his attorney would be private, and did not discover that he had been taped until after it was publicly revealed that the State Police engaged in routine taping.

■ To the extent Galazan asserts claims resting on the alleged recording of the telephone line on which he conversed with his attorney, his motion is indistinguishable from plaintiffs' motion for partial summary judgment, and is likewise denied. Galazan's claim that the conversation also was recorded on the polygraph machine, however, presents

an issue not previously discussed. Since the conversation was recorded as it was overheard, it constitutes an "oral communication," not a "wire communication," under Title III. *See* 18 U.S.C. § 2510(2).

■■■■ For an oral communication to be protected by Title III, "the speaker must have had a subjective expectation that the communication was not subject to interception, and this expectation must have been objectively reasonable." *United States v. Willoughby*, 860 F.2d 15, 22 (2d Cir.1988). Moreover, protection under the Act requires not simply an expectation that there will be no recording, but an expectation that the conversation is private. *See In re John Doe Trader Number One*, 722 F.Supp. 419, 425 (N.D.Ill.1989). Galazan asserts by affidavit that he expected that his conversation was private and was not overheard or recorded, and this claim is assumed to be true for the purposes of this motion. *See Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2552–53. A material issue of fact, however, exists concerning whether Galazan's belief was objectively reasonable. In particular, Galazan introduces as an exhibit the transcript allegedly produced from the recording made by the polygraph machine, which reveals that Galazan asked several questions of Trooper Palombizio while he used the telephone. It can be inferred from this fact that Palombizio remained in close physical proximity, calling into question the objective reasonableness of

Galazan's belief that his telephone conversation was private. Galazan's motion accordingly is denied.

## VI. State of Connecticut's Motion to Dismiss

■■■■ Finally, defendant State of Connecticut moves to dismiss plaintiffs' claim for indemnification of the individual defendants, pursuant to sections 29–8a(a) and 4–16a of the Connecticut General Statutes,[45] as alleged as Count IV of both complaints. The State's motion will not be granted "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see also Patton v. Dole*, 806 F.2d 24, 30 (2d Cir.1986). Further, the Court accepts all plaintiffs' factual allegations as true and draws all reasonable inferences from those allegations in the light most favorable to plaintiffs. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Corcoran v. American Plan Corp.*, 886 F.2d 16, 17 (2d Cir.1989).[46]

The State argues that plaintiffs' claims for indemnification from the State are barred by the Eleventh Amendment, and that plaintiffs lack standing to claim indemnification on behalf of the individual defendants. The State also asserts that the claims themselves do

**45.** Section 29–8a(a), entitled "Indemnification of state policemen and state capitol security police in civil rights actions. Fees and costs," states as follows:

The state shall protect and save harmless any state policeman from financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand, suit or judgment by reason of the alleged deprivation by such state policeman of any person's civil rights, which deprivation was not wanton, reckless or malicious, provided such state policeman, at the time of the acts resulting in such alleged deprivation, was acting in the discharge of his duties or within the scope of his employment or under the direction of a superior officer.

Conn.Gen.Stat. § 29–8a(a). Section 4–16a, entitled "Indemnification of commissioners," is substantively identical and applies to "all department heads as defined in section 4–5." *See* Conn.Gen.Stat. § 4–16a. Section 4–16a there-

fore applies only to defendants Lester Forst and Donald Long, who were former Commissioners of Public Safety, while section 29–8a(a) applies to all other individual defendants.

**46.** Plaintiffs argue that the Court should not consider the motion because it was not timely filed, and because it constitutes a motion for reconsideration of the Court's May 2, 1991 filed Ruling on Motion to Dismiss, in violation of Local Rule 9(e). The State's motion is timely, however, because it raises the question of the Court's subject matter jurisdiction. *See* Fed.R.Civ.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."); *see also Travelers Indemn. Co. v. Household Intn'l, Inc.*, 775 F.Supp. 518, 523 (D.Conn.1991). Moreover, the Court's May 2, 1991 filed Ruling did not address the indemnification issue, and thus there was no decision to reconsider. Accordingly, no procedural bar exists to the State's motion.

not raise a justiciable case or controversy, because the liability of the individual defendants has yet to be adjudicated.

 Plaintiffs' claim for indemnification raises no Eleventh Amendment issue. Rather, if construed liberally, both Count IV of plaintiffs' Third Amended Complaint and Count IV of intervening plaintiffs Third Amended Complaint seek a declaration that the individual defendants' alleged conduct falls within the purview of the applicable indemnification statutes. Because plaintiffs' indemnification claim does not seek retrospective monetary relief, it is not barred by the Eleventh Amendment. *See Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238, 105 S.Ct. 3142, 3145, 87 L.Ed.2d 171 (1985); *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 906–07, 79 L.Ed.2d 67 (1984).

 Plaintiffs and intervening plaintiffs also have standing to seek such a declaratory judgment. The principle concern of the standing question is "whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (emphasis in original, quotation omitted). Plaintiffs' potential recovery in this action exceeds the individual defendants' assets, and thus they possess a "personal stake" in a determination that the State will indemnify any judgment rendered in their favor.

 More troubling is the question of justiciability, given that the individual defendants' liability and damages have not yet been determined. Plaintiffs' claim proceeds under the Declaratory Judgment Act, § 2201 *et seq.,* which requires a showing "that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). While there is some dispute between the parties whether a Connecticut court would entertain an indemnification claim at this juncture, such a determination is not dispositive of the issue of federal jurisdiction. *See Cincinnati Ins. Co. v. Holbrook,* 867 F.2d 1330, 1333 (11th Cir.1989) ("[T]hat the doors of Georgia's courts are closed to [plaintiff] unless and until [liability] has been determined, does not mean that the doors of the federal courts are automatically closed to Cincinnati...."). Rather, the Court must look to whether plaintiffs' indemnification claim seeks a declaration of "the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201. The declaration of rights under insurance policies, including the right of indemnification, previously has been found to be the proper subject of a declaratory judgment action in federal court, and similarly is appropriate here. *See Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941) (holding suit by insurance company against insured and claimant, seeking declaration it had no duty to indemnify insured, was justiciable under Declaratory Judgment Act); *see also Eureka Federal Sav. & Loan Assoc. v. American Casualty Co.,* 873 F.2d 229, 231 (9th Cir.1989); *Cincinnati Ins. Co.,* 867 F.2d at 1333; *Sears, Roebuck & Co. v. Zurich Ins. Co.,* 422 F.2d 587, 588–89 (7th Cir.1970).

 This issue ultimately reduces to the discretionary decision to exercise jurisdiction over pendent state law claims. As discussed above, plaintiffs assert substantial federal claims against both the individual defendants and the State, and their indemnification claim constitutes but one of several pendent state law claims against all defendants. Under *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Court has the power to hear these pendent state law claims, and the decision to exercise jurisdiction over each of them lies within the Court's discretion. *Id.* at 726, 86 S.Ct. at 1139; *Miller v. Lovett,* 879 F.2d 1066, 1071–72 (2d Cir.1989). In determining whether to exercise pendent jurisdiction over plaintiffs' indemnification claim, the Court must weigh the factors of economy, convenience and fairness. Concerns for judicial economy and convenience tip decidedly in plaintiffs' favor, given the identity of the factual issues presented by the federal and the state claims.

If plaintiffs succeed in obtaining a judgment under federal law against the individual defendants, resolution of the indemnification question in the same trial would be the most economical and efficient use of judicial resources. In the circumstances presented by this case, therefore, the exercise of pendent jurisdiction over the indemnification claims is appropriate. *See Carlson v. Jordon,* H–83–697 (JAC) (D.Conn. Nov. 15, 1985). Accordingly, defendant State of Connecticut's motion to dismiss is denied without prejudice.

## CONCLUSION

For the reasons stated above, the pending motions in this action are decided as follows: the individual defendants' motion for summary judgment [# 1580] is hereby GRANTED as to plaintiffs' claims under the First and Ninth Amendments to the United States Constitution, and in all other respects it is hereby DENIED; defendant State of Connecticut's Motion to Dismiss Count VI of each complaint [# 1595] is hereby DENIED without prejudice; plaintiffs' Motion for Partial Summary Judgment [# 1584] is hereby DENIED; plaintiffs Fluery and Coe's Motion for Summary Judgment [# 1586] is hereby DENIED; plaintiff Galazan's Motion for Summary Judgment [# 1592] is hereby DENIED; and intervening plaintiff Pagoni's Motion for Partial Summary Judgment [# 1597] is hereby DENIED. The Court's March 31, 1995 filed Order with respect to the above motions is hereby ORDERED vacated in light of this Ruling. Plaintiffs and intervening plaintiffs shall file amended complaints, in accordance with this Ruling, by May 31, 1995.

SO ORDERED.